**LaSOCIETE GENERALE IMMOBILI-ERE, a French corporation; LSGI, Inc., a Delaware corporation, Appellees/Cross-appellants,**

v.

**MINNEAPOLIS COMMUNITY DEVELOPMENT AGENCY; City of Minneapolis, Appellants/Cross-appellees.**

No. 93–3123, 93–2920.

United States Court of Appeals, Eighth Circuit.

Submitted May 11, 1994.

Decided Dec. 22, 1994.

Rehearing and Suggestion for Rehearing En Banc Denied Feb. 17, 1995.*

---

\* Bowman and Magill, Circuit Judges, would grant the suggestion for rehearing en banc. Loken and Murphy, Circuit Judges, took no part in the consideration or decision of this case.

Robert Reinhart, Minneapolis, MN, argued (Edward Wahl, Michael Keyes, Charles Quaintance, Jr., David Herr, Richard Wilson, Justin Perl, Robert Alfton and Larry Warren, on the brief), for appellants.

Carter Phillips, Washington, DC, argued (Mark Hopson, Paul Kalb and Nathan Sheers, Washington, DC, Michael Mahoney, Mark Peery, and Douglas Kelley, Minneapolis, MN, on the brief), for appellees.

Before McMILLIAN, Circuit Judge, LIVELY,** Senior Circuit Judge, and WOLLMAN, Circuit Judge.

McMILLIAN, Circuit Judge.

The Minneapolis Community Development Agency and the City of Minneapolis appeal from a final judgment entered in the United States District Court for the District of Minnesota upon a jury verdict finding them liable to La Societe Generale Immobiliere and LSGI, Inc., for the breach of a development contract and for injury to the developer's reputation in violation of the Due Process Clause of the Fourteenth Amendment. *La Societe Generale Immobiliere v. Minneapolis Community Dev. Agency,* 827 F.Supp. 1431 (D.Minn.1993) (Order). For reversal, appellants argue that the district court erred in holding that: (1) the development contract at issue was ambiguous, (2) the City or the Mayor breached the contract, and (3) the claims brought under 42 U.S.C. § 1983 were cognizable as a matter of law. Appellants

** The Honorable Pierce Lively, Senior United States Circuit Judge for the Sixth Circuit, sitting by designation.

have also raised a number of issues with regard to damage calculation. La Societe Generale Immobiliere and LSGI, Inc., filed a cross-appeal on the issue of damages. For the reasons discussed below, we reverse the judgment of the district court.

## I. BACKGROUND

In mid–1985, the Minneapolis Community Development Agency (MCDA)[1] and the City of Minneapolis (jointly, the "City") granted La Societe Generale Immobiliere (LSGI), a French real estate company, exclusive rights to negotiate the development of a new shopping center on Nicollet Mall in downtown Minneapolis. The project contemplated 900,-000 square feet of retail shops and stores, a 400,000 square foot office building, and an underground parking garage. The development rights extended over three and one-half blocks with the project's center on the City's north-south axis street, Nicollet Mall.

LSGI's plans envisioned a dome over the Nicollet Mall and the depression of the street into a tunnel (the so-called "dome and tunnel" design). This proposed design was immediately the subject of controversy, and a number of city officials and local businesspersons expressed reservations about the concept. As part of this debate, on July 25, 1986, the City Council commissioned a Committee on the Future of the Nicollet Mall (Mall Committee). The overall design of the project was among the issues that the Mall Committee was to consider. John Cairns, an attorney for LSGI, served on the Mall Committee as an LSGI representative. On the same day the City Council created the Mall Committee, it also approved the sale of seventy-three million dollars of tax increment bonds for the project "subject to final design approval of the project's treatment of the Nicollet Mall by the City Council." Minneapolis Mayor Donald M. Fraser did not approve of this City Council action because, among other things, he had concerns about the project's design. However, the City Council's action became effective on July 31, 1986, because of the Mayor's inaction.

By September 1986, negotiators for MCDA and LSGI had largely completed the drafting of a Development Agreement as well as a lease and related documents. Attached to the Development Agreement were various exhibits, including a set of LSGI's preliminary plans for the dome and tunnel design. Before the Development Agreement could be executed, the MCDA Board and the Mayor were required to approve it. This approval would have authorized the Executive Director of the MCDA to sign the Development Agreement. On September 26, the Board gave its authorization, but on October 2, the Mayor vetoed this resolution and expressed his concern that LSGI would market the proposed project using the dome and tunnel design concept. The Mayor specifically stated:

> If we sign this contract [the Development Agreement] we will be telling [LSGI] that we are prepared to go ahead with the basic design which [they have] proposed for the south end of the mall. It is true that we have final design approval over the treatment of the mall, but clearly LSGI will be marketing their project based on their current design.

The Mayor requested a six-week delay in the execution of the Development Agreement to enable the Mall Committee to finish its work. He also expressed the view that the Development Agreement should clearly recognize the City's prerogative to take into account the conclusions of the Mall Committee before making a final decision about the dome and tunnel design concept. Public debate over the dome and tunnel design concept continued throughout this period.

Before the Mall Committee's process had run its course, LSGI responded to the Mayor's concern by proposing the addition of language to the Development Agreement that clarified the City Council's continuing control over the project's design. This language was to be added to Section 2.02 of the Development Agreement. Section 2.02 was

---

**1.** The MCDA is an agency whose responsibilities include assisting in economic development of the City of Minneapolis. The MCDA is governed by a thirteen-member Board of Commissioners comprised of the thirteen sitting City Council members. The MCDA also employs a professional staff.

titled "MCDA Approval" and was included under Article II of the Development Agreement which was titled "Plan Approval." The original version of Section 2.02 stated in relevant part:

> It is understood by the Developer and the MCDA that no action of the Minneapolis City Council shall be necessary to approve the form or content of any of the proposed Project Plans or Specifications except for final design approval of the Project's treatment of the Nicollet Mall by the City Council.

The revision added the following language to the end of the above-quoted sentence:

> and further except that any such proposed Project Plans or Specifications shall be modified by the Developer to comply with any and all design guidelines or any and all other requirements related to the treatment of the Nicollet Mall adopted by the Minneapolis City Council prior to the final approval by the MCDA of the Proposed Project Plans and Specifications.... ·

The Mayor was satisfied with this additional specific recognition of the City's continuing control over the dome and tunnel design concept. He therefore invited the MCDA Board to override his veto and to authorize execution of the Development Agreement. The Development Agreement was executed and became effective on November 3, 1986. In the Development Agreement, LSGI promised to obtain the commitments of two major department stores, or "anchor" tenants. LSGI also promised to secure financing, present detailed final project plans, produce a number of other agreements, and resolve certain issues related to the project. During the year following execution of the Development Agreement, LSGI's design continued to create public controversy. In December 1986, the Mall Committee issued a report which recommended that transportation on the Nicollet Mall should remain at grade. The Mall Committee also recommended that the historical environmental feeling of openness of the Mall should be retained. Meanwhile, LSGI showed preliminary plans for the project, which included the dome and tunnel design concept, to numerous department stores throughout the country.

On November 3, 1987, the anniversary of the execution date of the Development Agreement and the date set for closing, LSGI had delivered the commitment of only one anchor tenant, Nordstrom's. LSGI produced only a letter of possible interest from the Neiman–Marcus chain. LSGI also failed to comply with a number of the other contractual obligations that were to be accomplished by November 3, 1987. LSGI, therefore, sought an extension of the Development Agreement in the form of a Post–Closing Agreement. The Post–Closing Agreement included a Post–Closing Schedule that gave LSGI a thirty-day extension to secure a second anchor tenant. LSGI, however, was unable to secure a second anchor.

Prior to the execution of the Post–Closing Agreement, the MCDA Board adopted a resolution referred to as the "Cramer Resolution," directing City officials working in consultation with the Nicollet Mall Implementation Staff (successor to the Mall Committee), the MCDA, and LSGI, to develop design guidelines for the project within thirty days that did not include a dome or a tunnel. The Cramer Resolution, which effectively rejected the dome and tunnel design concept, was debated and enacted at a public meeting of the MCDA Board of Commissioners on November 3, 1987. Two LSGI lawyers were present at the meeting. LSGI principal Bala Safyurtlu was also present. During the course of the meeting, the MCDA's attorney told the Board that the Development Agreement permitted the Cramer Resolution. No LSGI representative attempted to contradict this representation. Moreover, an LSGI attorney, John Cairns, made the following statement to the Board:

> On this question of design let me just tell you that we have said for months if not twelve months since we were here with you a year ago that we will reach a consensus on that design with you and you get the final shot at it. That's still in the contract, that's always been there....

Neither the other LSGI attorney present nor LSGI principal Safyurtlu challenged this assertion. Five hours after the Cramer Resolution was enacted, LSGI and the City executed the Post–Closing Agreement which

postponed many of LSGI's deadlines and contained language regarding the City Council's right to final design approval which corresponded to similar language in the Development Agreement.

After the adoption of the Cramer Resolution, the *Minneapolis Star–Tribune* reported that Bruce Nordstrom, co-chair of Nordstrom's department stores, was surprised by the Cramer Resolution. On November 5, 1987, after reading Mr. Nordstrom's comments, Mayor Fraser wrote Nordstrom a letter explaining the planning and development process and assuring him of the City's continuing interest in Nordstrom's: "We very much want you to place a store in Downtown Minneapolis." On November 16, Mayor Fraser sent a similar letter to Robert Smith of Neiman–Marcus. The Mayor explained the City's position on the dome and tunnel design concept, but at the same time, he emphasized the City's desire to have Neiman–Marcus locate a store on the Nicollet Mall. During this time period, Mayor Fraser addressed a class of architecture students at the University of Minnesota. This lecture was secretly recorded, and its substance was reported in the *Skyway News,* a weekly local paper. As Mayor Fraser discussed the day-to-day difficulties of urban planning, he made reference to the Nicollet Mall project. According to the article, the Mayor specifically mentioned LSGI in the course of his discussion and later generally commented: "One of the things I've learned about developers is that they'll promise you anything.... Never believe a thing they say. Only when you get to the bottom line can you believe them."

On November 16, 1987, the "614 Company," which owned property in the area to be acquired by the City under the lease for the project, sued the MCDA in state district court alleging a temporary taking of its property, requested an order to compel the MCDA to resubmit the LSGI Development Agreement to the City Council for review and approval, and sought attorney's fees and other relief. Approximately two months later and seven weeks after the extended deadline for LSGI to secure a second anchor, the MCDA notified LSGI that it was in default under the Post–Closing Agreement to the Development Agreement and under the Lease between the parties. MCDA stated that LSGI's failure to secure a second anchor was the basis for the default. This notice started a sixty-day period to cure the default that would be followed by a thirty-day period to avoid termination. On January 28, 1988, LSGI advised the City that the suit by the 614 Company constituted an unavoidable delay, as defined in the Development Agreement, until the litigation was resolved, and therefore, LSGI's rights under the Development Agreement could not be terminated.

On March 7, 1988, LSGI presented new basic design plans to the MCDA. On April 1, 1988, the City Council approved LSGI's plans and its design treatment of the Nicollet Mall as required by the Development Agreement. In addition, the City granted LSGI an extension until May 8, 1988, to produce evidence of a second major anchor tenant's commitment to lease space in the project and to provide evidence of project financing. On April 7, 1988, the Mayor vetoed the City Council's action of April 1, but on April 8, the veto was overridden by the City Council. By a letter dated that same day, the MCDA notified LSGI that unless LSGI cured its default by May 9, 1988, the MCDA would terminate LSGI's rights under the Development Agreement. By a letter dated May 11, 1988, the Executive Director of the MCDA informed LSGI that the period in which LSGI could cure its default under the Development Agreement had expired. However, the Director also informed LSGI that the MCDA was willing to forego termination of the Development Agreement if LSGI would agree to attempt the negotiation of an amended Development Agreement. These negotiations took place and lasted until May 1989, but they never resulted in the execution of an amended Development Agreement. On May 12, 1989, the MCDA Board, over LSGI's opposition, voted to terminate the Development Agreement, and on June 1, 1989, the MCDA did in fact terminate the Development Agreement. This litigation followed shortly thereafter.

LSGI claimed that the City breached the Development Agreement and deprived LSGI of its constitutional rights under the Fourteenth Amendment. After a three-week tri-

al, a jury found that City liable for breach of contract and loss of reputation, and judgment was entered on March 8, 1993 in the amount of $34,319,739. This amount reflected the jury's awards of $3,239,804 for reimbursement of out-of-pocket expenses, $22,500,000 for loss of projected future profits, and $8,579,935 for harm to LSGI's reputation. This amount was later reduced by the district court to $17,280,000 as a result of the City's post-trial motion. The City's motion for judgment as a matter of law and a new trial was denied. The City now appeals from the final judgment, and LSGI cross-appeals from the district court's post-trial denial of out-of-pocket expenses and the remittitur.

## II. DISCUSSION

### A. Contract Ambiguity

At trial, LSGI argued that the MCDA breached the Development Agreement by rejecting the dome and tunnel design concept in the Cramer Resolution. LSGI argued that the MCDA waited until it was too late to reject the dome and tunnel design concept, and therefore, the MCDA Board lacked the authority to eliminate the dome and tunnel design concept. The City argues that the district court erred in failing to grant judgment as a matter of law in favor of the City on LSGI's breach of contract claims. The

City contends that under the Development Agreement it unambiguously retained the authority to exercise final design approval over the treatment of Nicollet Mall, specifically, the authority to reject the dome and tunnel design concept. Thus, the City concludes that the Cramer Resolution cannot therefore constitute a breach of the agreement. In response, LSGI argues that it had provided proposed Project Plans and Specifications more than sixty days before the Closing Date, as required by Section 2.02 of the Development Agreement, and that the MCDA by inaction "approved" those proposed Project Plans and Specifications before the adoption of the Cramer Resolution.[2] LSGI contends this resolution was a breach of the Development Agreement because once the proposed Project Plans and Specifications were "approved" under Section 2.02 of the Development Agreement, the MCDA had no power to reject the dome and tunnel design concept. The district court concluded that Section 2.02 was ambiguous and therefore allowed the jury to interpret the Development Agreement.

■■■ We review the district court's determination of Minnesota law de novo. *Medtronic v. ConvaCare*, 17 F.3d 252, 255 (8th Cir.1994). Under Minnesota law, the construction and effect of a contract presents a

2. Section 2.02 of the Development Agreement provided in relevant part:

No later than sixty (60) days prior to the Closing Date, the Developer shall submit two sets of proposed Project Plans and Specifications for the Project to the MCDA for review and approval. . . .

The MCDA shall review the proposed Plans and Specifications so submitted to it by the Developer for general conformance to the Preliminary Plans within fifteen (15) business days of the date on which such materials were submitted by the Developer. If the MCDA reasonably determines the proposed Project Plans and Specifications submitted are in general conformance with the Preliminary Plans and this agreement, the MCDA shall promptly cause one copy of them to be executed by its appropriate official indicating such approval and to be returned to the Developer within such period. Those proposed Plans and Specifications so approved shall become a part of the Project Plans and Specifications. If the MCDA reasonably determines that the materials submitted are not in general conformance with the Preliminary Plans and this Agree-

ment, and thus declines to approve them, it shall provide to the Developer within such fifteen (15) business day period a signed letter indicating with reasonable specificity the areas in which the MCDA believes there is not conformance and shall also indicate such adjustments the MCDA believes are necessary to secure its approval. The Developer may then submit such revisions to the proposed Project Plans and Specifications as it deems necessary to meet the objections of the MCDA so as to bring the proposed Project Plan [sic] and Specifications into conformance with the Preliminary Plans and this Agreement (in which case the MCDA must respond within the time frame and in the manner indicated above). If the MCDA fails to respond within the fifteen (15) business day period, the proposed Project Plans and Specifications so submitted shall be deemed approved and the MCDA shall, upon request, execute a certificate of approval. Once proposed Project Plans and Specifications are approved as set forth above, and any other conditions required by this Agreement are fulfilled, the Developer may commence the construction to which the items relate.

question of law, unless an ambiguity exists. *Trondson v. Janikula,* 458 N.W.2d 679, 681 (Minn.1990). The initial question of whether a contract is ambiguous is a question of law to be decided by the trial court. *Lamb Plumbing & Heating Co. v. Kraus–Anderson,* 296 N.W.2d 859, 862 (Minn.1980). "Ambiguity exists when the language of a written document, by itself, is reasonably susceptible to more than one meaning." *Trondson,* 458 N.W.2d at 681. However, when the intention of the parties to a contract is ascertainable from the writing, construction is for the court. *Chergosky v. Crosstown Bell,* 463 N.W.2d 522, 525 (Minn. 1990). When the court construes a contract, it must construe the contract as a whole and attempt to harmonize all clauses of the contract. *Id.*

■ In our review of the district court's denial of the City's motion for judgment as a matter of law, we must first determine whether the district court was correct in concluding that the Development Agreement was ambiguous. The district court reiterated its conclusion as to ambiguity when ruling on the City's post-trial motion:

> The court found, and maintains, that it is not clear from the plain language what the parties intended in their use of the term "final design treatment." It is, perhaps, conceivable that this provision granted the defendants unfettered discretion to reject LSGI's design at any time, as the defendants contend. The Court finds, however, that it is at least as likely that the provision simply provided for final touch-up and refinement of minor issues. Because of this patent ambiguity, the interpretation of this provision was submitted to the jury.

827 F.Supp. at 1435. We note that the district court mistakenly seized upon the term "final design treatment" in order to demonstrate what it deemed to be a patent ambiguity. However, the term "final design treatment" does not appear anywhere in Section 2.02 of the Development Agreement. The district court order misquoted Section 2.02 of the Development Agreement:

> It is understood by the Developer and the MCDA that no action of the Minneapolis City Council shall be necessary to approve the form or content of any of the proposed Project Plans or Specifications except for *final design treatment* of the Nicollet Mall by the City Council. . . .

827 F.Supp. at 1434 (emphasis added). The first exception of Section 2.02 should read: "except for final design *approval of the Project's* treatment of the Nicollet Mall by the City Council." [3] Appellants' Appendix at 216 (emphasis added).

This misquotation is important because the district court erroneously relied on the phrase "final design treatment" in finding that the Development Agreement was ambiguous. While the district court's fear of equivocation in any attempt to interpret "final design treatment" may have been justified, the phrase "final design *approval* of the Project's treatment of the Nicollet Mall" does not warrant such concern. It is clear from the Development Agreement that the City Council retained the right to have the final shot at any proposed design. The Development Agreement further clearly provided that the City Council had to act affirmatively to give its "final design approval." The evidence was undisputed at trial that the City Council had not yet taken such action. Therefore, at the time the MCDA Board of Commissioners, the thirteen sitting council members, passed the Cramer Resolution calling for the design to retain the Mall's historic feeling of openness and to leave the street traffic at grade, the City Council unmistakably held the power to approve or disapprove of the Project's design treatment of the Nicollet Mall.

The district court's concern over the word "treatment" was also misplaced. "Because a word has more than one meaning does not mean it is ambiguous. The sense of a word depends on how it is being used; only if more than one meaning applies within that context does ambiguity arise." *Board of Regents v. Royal Ins. Co. of America,* 517 N.W.2d 888, 891 (Minn.1994). There are no

---

**3.** This correct version appears on page # 11 of Trial Exhibit 2. The district court order refers to Trial Exhibit 3. We assume that this was merely a typographical error because Trial Exhibit 3 was the Post–Closing Agreement, which did not have eleven pages.

conflicting uses of the word "treatment" in the Development Agreement. Minnesota law commands that we give contract terms their plain and ordinary meaning. *See Litton Microwave Cooking Prod. v. Leviton Mfg. Co.*, 15 F.3d 790, 796 (8th Cir.1993) (applying Minnesota law). Because the Development Agreement provided no special definition of the term "treatment," we give the term its ordinary meaning, and therefore, we conclude that the phrase "final design approval of the Project's treatment of the Nicollet Mall" must include approval of the dome and tunnel design concept. Had the parties merely intended for the City Council to have the authority to approve only "final touch-up and refinement of minor issues," such intention would have been made explicit in the Development Agreement. Nothing in the Development Agreement indicates that we should read the phrase to be, in any way, a limitation on the scope of the City Council's authority to reject completely a particular design concept. The language of the Development Agreement clearly provided the "unfettered discretion" which the district court considered a mere possibility under its "final design treatment" analysis. We hold, therefore, that the Development Agreement was not ambiguous.

The authority of the City Council to give or to withhold its final design approval hung like the Sword of Damocles over the heads of LSGI. As Justice Thurgood Marshall noted in another context, the value of the Damoclean Sword is "that it hangs—not that it drops." *Arnett v. Kennedy*, 416 U.S. 134, 231, 94 S.Ct. 1633, 1682, 40 L.Ed.2d 15 (1974) (Marshall, J., dissenting). On November 3, 1987, the City Council's sword, its power to approve or reject the final design concept, was still in place. LSGI may well have been unwise to grant the City Council such authority, but, where, as here, two sophisticated parties negotiated a commercial contract which was executed in the absence of fraud, duress, or any other form of unconscionabili-

ty, we will not rewrite the contract in order to save a contracting party from its own poor decisions. *See In re Stevenson Assoc.*, 777 F.2d 415, 421 (8th Cir.1985) (applying Minnesota law); *Telex Corp. v. Data Prod. Corp.*, 271 Minn. 288, 135 N.W.2d 681, 687 (1965) ("It is not ordinarily the function of courts to rewrite, modify, or set aside contract provisions fully considered and agreed upon between the parties."); *see also Morello v. Federal Barge Lines*, 746 F.2d 1347, 1351 (8th Cir.1984) ("Courts of law do not sit in order to save parties from their contractual mistakes.").

■ LSGI argues that under the second exception of Section 2.02 of the Development Agreement, only the City Council and not the MCDA Board had the authority to adopt the Cramer Resolution. That exception provided for LSGI's compliance with "any and all design guidelines or any and all other requirements related to the treatment of Nicollet Mall adopted by the Minneapolis City Council prior to final approval by the MCDA of the proposed Project Plans and Specifications." LSGI attempts, through a highly technical reading, to create a distinction between the MCDA Board and the City Council to support its theory of breach, i.e. that the MCDA did not have authority on November 3, 1987, to pass the Cramer Resolution.[4] Applying the close reading urged by LSGI, we conclude that the second exception made clear the City Council's ability to exercise control over and inject its views into the project design development process. The language of this second exception cannot be read to limit the authority of the City Council, provided in the first exception, to approve or reject the final design concept. Because the City Council clearly retained its plenary power to grant or deny final design approval on November 3, 1987, the action of the council members, sitting as the MCDA Board, cannot, as a matter of law, constitute a breach of the Development Agreement.

4. While addressing a different issue, the district court had occasion to make the following statement with regard to the relationship between the City Council and the MCDA: "Throughout this litigation, the parties have agreed that it was unnecessary to distinguish between the City of Minneapolis and the MCDA. The members of the MCDA board and the members of the Minneapolis City Council are the same individuals. These two public bodies functioned in complete congruity with respect to the LSGI contract." 827 F.Supp. at 1437.

## B. *The Mayor's Statements*

LSGI also argued that certain statements made by Mayor Fraser in November 1987 constituted a breach of the Development Agreement because they hindered LSGI's ability to secure a second anchor tenant. These statements consisted of the letter to Robert Smith of Neiman–Marcus, the letter to Bruce Nordstrom of Nordstrom's department stores, and the remarks about the trustworthiness of developers made in an address to a group of architecture students at the University of Minnesota. The City argues that LSGI's claim of breach of the contract predicated on these statements must fail as a matter of law because LSGI introduced no evidence to establish a causal link between any of these statements and the inability of LSGI to secure a second anchor tenant. Further, the City claims that the Mayor's remarks to the architecture class regarded a matter of public concern and were therefore privileged. LSGI responds to this argument of privilege by claiming that any immunity exists to protect public officials from tort actions and not from breach of contract actions. LSGI also contends that if the Mayor did have immunity in this case, it would be personal only and would not protect the City from liability.

 Minnesota law provides that "contract performance is excused when it is hindered or rendered impossible by the other party." *Zobel & Dahl Constr. v. Crotty*, 356 N.W.2d 42, 45 (Minn.1984). Further, "a breach of contract occurs under those circumstances." *Id.* Minnesota law also provides that there must be a causal link between the alleged breach and the party's claimed damages. *See Nguyen v. Control Data Corp.*, 401 N.W.2d 101, 105–06 (Minn. Ct.App.1987). Causation is a question of fact, and the jury's conclusion will not be upset "unless the court finds it to be manifestly contrary to the weight of the evidence." *Lamke v. Louden*, 269 N.W.2d 53, 56 (Minn.1978).

 We hold the record before us does not support the jury's finding of causation. LSGI simply produced no evidence that the Mayor's letters had any adverse effect on its attempt to secure a second an-

chor tenant. With regard to the letter to Neiman–Marcus, its representative testified that the Mayor's letter had no effect on his company's decision to back away from its initial statement of interest in the project. However, even if LSGI had produced such evidence, the evidence would have to demonstrate that the letters were in some way inconsistent with any action which the City could properly take under the terms of the Development Agreement. Minnesota law does not provide for a breach of contract action for any and all hindrances of one party's performance by the action of another. Rather, "every contract contains an implied condition that each party will not *unjustifiably* hinder the other from performing." *Zobel & Dahl Constr.*, 356 N.W.2d at 45 (emphasis added). The City's rejection of the dome and tunnel design concept may have made it more difficult for LSGI to fulfill its obligation to secure two anchor tenants, but where the City's action was authorized by the Development Agreement, such action was not an unjustifiable hindrance and thus cannot constitute the basis for a claim of breach of contract. Therefore, the Mayor's letters, which did no more than explain the City's action, cannot, as a matter of law, breach the Development Agreement.

 With regard to the Mayor's remarks to the architecture class, we will assume for purposes of analysis only that they were not privileged. Arguing against the application of any sort of privilege, LSGI itself noted that this claim is not a tort claim, but a breach of contract claim. LSGI had to come forward with some evidence to show that the Mayor's remarks did in fact unjustifiably hinder its ability to secure a second anchor tenant. LSGI, however, presented no evidence that the *Skyway News* report of the Mayor's remarks in any way adversely affected LSGI's ability to secure a second anchor tenant. LSGI would have us consider the mere fact that it did not obtain a second anchor tenant to be sufficient proof of causation. Without any evidence that these statements adversely influenced the decision-making process of a prospective anchor tenant or otherwise unjustifiably hindered LSGI's performance, LSGI's claim that the Mayor's re-

marks about the trustworthiness of developers effectively breached the Development Agreement is also insufficient as a matter of law.

### C. *Unavoidable Delay*

There is some dispute between the parties as to whether a theory of unavoidable delay based on the 614 Company litigation was submitted to the jury as a separate ground upon which it could find the City liable for breach of contract. LSGI contends that it did not affirmatively argue unavoidable delay to the jury as a separate ground for finding a breach, but at the same time, it maintains that termination during a period of unavoidable delay would be improper. Further, it has argued that the 614 Company lawsuit did represent an unavoidable delay under the terms of the Development Agreement. Because the verdict form simply asked whether the City breached the Development Agreement and because the district court instructed the jury that unavoidable delay, not caused by either party, would excuse nonperformance, we will assume for purposes of analysis that a theory of unavoidable delay was presented to the jury as an independent theory of the City's breach of the contract. This approach is consistent with our duty to analyze the evidence in the light most favorable to the prevailing party when reviewing the denial of judgment as a matter of law (JNOV). *White v. Pence*, 961 F.2d 776, 779 (8th Cir.1992).

Under the Development Agreement, a third party lawsuit constituted an "unavoidable delay" and postponed the timing for the fulfillment of obligations made subject to any unavoidable delay. Therefore, LSGI's argument is that the City's termination of the Development Agreement was wrongful because LSGI's failure to obtain a second anchor tenant could not serve as a proper basis for the City's action in light of the 614 Company lawsuit. The City asserted in its brief that the evidence was uncontradicted that the 614 Company lawsuit was not caused by the MCDA and that the 614 Company litigation was still pending. Therefore, the third party action was an "Unavoidable Delay" as that term is defined by the Development Agreement. Section 15.03 of the Development Agreement provided that the City's right to terminate the contract was "subject to Unavoidable Delays." The language of this section requires us to consider the provisions of Section 17.08 entitled "Enforced Delay in Performance Beyond Control of Party." This section allowed an extension for performance of any obligation made subject to unavoidable delays "provided, that the party seeking the benefit of the provision of this section shall, within thirty (30) days after the beginning of any such Unavoidable Delay, have first notified the other party thereof, and requested an extension for the period of such delay." In considering the parties' motions for summary judgment, the district court noted that the 614 Company lawsuit was commenced on November 18, 1987, and that LSGI's first written assertion of unavoidable delay did not occur until January 28, 1988. Further, the district court noted that LSGI did not dispute the fact that its notice was tardy. The district court ruled, however, that the notice provision should not be enforced under Minnesota law unless the party who was to receive notice could prove prejudice. *La Societe Generale Immobiliere v. The Minneapolis Community Dev. Agency*, No. 3–89–372, slip op. at 12 (D.Minn. July 19, 1990) (Summary Judgment Order). Finding that prejudice to the MCDA was unlikely here, the district court denied summary judgment on this ground.

To support its understanding of Minnesota law on the enforcement of notice provisions, the district court relied on two cases which involved circumstances unique to the insurance industry. *See St. Paul Fire & Marine Ins. Co. v. Wabash Fire & Casualty Ins. Co.*, 264 F.Supp. 637 (D.Minn.1967); *Reliance Ins. Co. v. St. Paul Ins. Co.*, 307 Minn. 338, 239 N.W.2d 922 (1976). The district court improperly relied on these insurance cases in order to disregard the clear language of the commercial development contract at issue in the present case. In *Reliance*, for example, the Supreme Court of Minnesota was called upon to decide whether an attorney being sued for malpractice lost the benefit of her liability insurance policy by failing to notify her insurer in the timely manner required by the policy. Concluding that the insured's

late notification did not bar coverage, the court stated:

> One of the prime reasons for this type of liability insurance is to pay damages caused by certain acts or omissions of the insured.... The very nature of these peculiarities insured against indicates that this type of insurance is not only a contract between the insurer and the insured but also a contract for the benefit of the public. Therefore, we hold that despite delay in notification the insurers are required to afford coverage under their contracts in the absence of actual prejudice, should liability be otherwise shown according to the terms of the policies.

239 N.W.2d at 924. The limited nature of this holding does not fairly support the district court's expansive conclusion that notice provisions in all types of contracts will not be enforced in the absence of actual prejudice. But for the district court's summary judgment order in this case, we have found no authority for the broad application of *Reliance* to contracts in general.[5] When interpreting commercial contracts like the one before us, we will give notice provisions their plain and ordinary meaning. Therefore, LSGI could not seek the benefit of the extension for performance provided under Section 17.08 of the Development Agreement because, by its own admission, it did not timely notify the City of its desire to take advantage of the unavoidable delay extension. Consequently, it was not improper for the City to base its decision to terminate the Development Agreement on LSGI's inability to secure a second anchor tenant. The City was therefore entitled to judgment as a matter of law on the unavoidable delay theory.

### D. *Section 1983 claims*

The City also argues the district court erred in denying its motion for judgment as a matter of law on LSGI's constitutional claims. LSGI claimed that it was deprived of both a property interest and a liberty interest, and further asserted that it

was denied both procedural and substantive due process. The district court granted the City's motion for judgment as a matter of law on LSGI's property claim, finding that LSGI's breach of contract claim provided an adequate post-deprivation state law remedy. *See Zar v. South Dakota Bd. of Examiners,* 976 F.2d 459, 465 (8th Cir.1992). However, the district court found sufficient evidence to submit LSGI's liberty claims to the jury. The district court concluded that the Supreme Court's rejection of Section 1983 claims based on injury to reputation alone was not a bar here because the harm to LSGI's reputation clearly occurred in connection with "the deprivation of an existing contractual right." 827 F.Supp. at 1437. Accordingly, LSGI contends in this appeal that it proved and the jury found that Mayor Fraser, acting on behalf of the City, deprived LSGI of a liberty interest, without due process of law, by substantially injuring its reputation in the context of the City's breach of contract.

Because we have concluded that the City did not deprive LSGI of a contractual right, the reasoning of the district court can no longer support the submission of the LSGI's liberty claims to the jury. Although it is our view that LSGI's due process claims were held together by a tenuous chain of legal reasoning fraught with weak links, we need not address all of the weaknesses because our conclusion that the City did not breach the contract is sufficient to dispose of the Section 1983 claims as well. LSGI properly concedes that the Supreme Court has made clear that injury to reputation alone cannot support a claim for deprivation of a liberty interest without an accompanying alteration of legal status. *See Paul v. Davis,* 424 U.S. 693, 708–09, 96 S.Ct. 1155, 1164, 47 L.Ed.2d 405 (1976). LSGI, however, argues that the Mayor's letters and statements simultaneously breached the contract and harmed its reputation. This argument must fail because we have concluded that the Mayor's actions did not, as a matter of law, breach the Develop-

---

5. In *Naylor v. The Minnesota Daily,* 342 N.W.2d 632, 635 (Minn.1984), the court cited to *Reliance* to support its conclusion that the state could assert failure to receive notice of claim as a defense under the state's Tort Claims Act if it could establish prejudice. It also noted that this result was "consistent with the court's construction of notice provisions in *insurance* contracts." *Id.* (emphasis added).

ment Agreement. The Mayor's letters and remarks did not effect a change in LSGI's legal status. The lawful termination of the Development Agreement and the Mayor's allegedly disparaging letters and remarks, made eighteen months earlier, cannot be joined together to establish a violation of the Due Process Clause. Because LSGI is now left with an ordinary claim of injury to reputation, its Section 1983 claims fail as a matter of law. *Id.; Clark v. Solem*, 628 F.2d 1120, 1121 (8th Cir.1980). Thus, we need not consider whether the Mayor's letters and remarks were defamatory; further, we need not consider any issues surrounding the City's liability for the Mayor's letters and remarks or any issues regarding immunity because, even assuming we resolved these issues in favor of LSGI, its Section 1983 claims would still fail as a matter of law.

## III. CONCLUSION

We hold the City was entitled to judgment as a matter of law on LSGI's breach of contract and civil rights claims. In light of our decision on liability, we need not address the issues raised on appeal and cross-appeal regarding damages. For the reasons discussed above, the judgment of the district court is reversed.