# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 08-2723

_____

Cherne Contracting Corporation,        *
                                   *
           Plaintiff - Appellant,     *
                                   *    Appeal from the United States
      v.                       *    District Court for the District
                                   *    of Minnesota.
Marathon Petroleum Company, LLC,  *
                                   *
           Defendant - Appellee.     *

_____

Submitted: March 11, 2009
Filed: July 22, 2009

_____

Before MURPHY, MELLOY, and SHEPHERD, Circuit Judges.

_____

MELLOY, Circuit Judge.

Cherne Contracting Corporation ("Cherne"), a heavy-industrial general contractor, sued Marathon Petroleum Company, LLC ("Marathon"), the owner and operator of a petroleum refinery in Detroit, Michigan, alleging breach of an implied contract and promissory estoppel. The district court[1] granted summary judgment for Marathon on all of Cherne's claims. Cherne appeals, and we affirm the judgment of the district court.

---

[1]The Honorable David S. Doty, United States District Judge for the District of Minnesota.

I.    Background

Cherne is a Michigan corporation with its principal place of business in Minnesota. Marathon is a Delaware Limited Liability Company with its principal place of business in Ohio. The amount in controversy is well in excess of $75,000, and we have diversity jurisdiction over this matter pursuant to 28 U.S.C. §§ 1291 and 1332.

In early 2004, Marathon contacted Cherne about performing revamp work at Marathon's Detroit refinery in advance of and during a refinery turnaround[2] initially scheduled for November 2004. Given the nature of the work to be performed, logistical difficulties with coordinating a complex project within an operating petroleum refinery, compressed time frames for completing work before and during the refinery turnaround, and incompletely defined engineering parameters, Marathon determined that it needed to hire a single-point-of-contact general contractor. Marathon also determined that it needed to seek a contract with a time-and-materials reimbursement scheme rather than a lump-sum payment. When Marathon described the project to Cherne, Cherne anticipated that the project would require approximately 170,000 worker hours across several disciplines, including, but not limited to, electrical, piping, engineering, structural, insulation, and painting work. It is undisputed that both parties initially discussed the project as though they hoped that Cherne would serve as general contractor for the entire project.

While it is clear that the parties had negotiated and communicated throughout winter and spring 2004, they did not reach a final agreement. The parties appear to have been nearing agreement and, in fact, had mutually agreed upon reimbursement terms for time and materials as set forth in an April 29, 2004 proposal ("April 29 Proposal") from Cherne to provide labor and materials at cost plus a determined

_____

[2]The parties and the district court refer to a refinery shut-down and repair period as a "turnaround." We adopt this label.

percentage mark-up. The parties documented many other terms in a draft agreement that remained unexecuted as of May 10, 2004. Notwithstanding these attempts, the parties had not agreed upon an overall cost estimate or an overall scope of work. On May 10, Marathon sent a Letter of Intent to Cherne, and on May 14, Cherne's president accepted and signed the Letter of Intent.[3] The Letter of Intent

[3]As relevant to the present appeal, the letter agreement provided:

Company [Marathon] hereby advises Contractor [Cherne] of its *intent to award* Contractor [the Contract] for time and material (T&M) planning services to complete the work at Company's Detroit, MI refinery based upon the mutually agreed T&M reimbursement terms quoted in the [April 29, 2004] Proposal.

Such award is contingent upon the following terms and conditions:

1)  A contract based upon Company's model document dated April 5, 2004 being <u>verbally</u> agreed by both parties on or before <u>May 24, 2004 (the "Contract)</u>. Both parties shall then execute such Contract on a mutually agreed date on or before <u>May 28, 2004</u>;

2)  *Mutual agreement on a T&M cost estimate for the Work* to be performed. Such estimate shall be based upon mutually agreed T&M rates and terms stipulated in Contractor's [April 29, 2004] Proposal;

3)  Company obtaining all required internal approvals for execution of the Contract;

4)  Any *unresolved issues regarding* full compliance with Company requirements, including but not limited to, *T&M cost estimate, scope of work*, schedule, manpower, equipment, payment, cost and progress monitoring requirements, insurance, license agreements, if applicable, the definition of Mechanical Completion, or any other unresolved contractual, commercial or technical matter *being resolved to Company's satisfaction prior to execution of the Contract*;

referenced a termination provision from the then-current draft agreement that permitted Marathon to terminate the relationship without cause. The referenced provisions of the draft agreement also detailed the parties' obligations regarding

> . . .
>
> 8) *Contractor's agreement that in the event any or all of the above contingencies are not satisfied, Contract Article 22, "Termination" of the terms and conditions included in the proposed Contract shall govern as to the rights of the parties in the event of termination of this Letter of Intent.*
>
> Company shall require Contractor to provide personnel for this project to *begin work prior to final execution of the Contract.* The parties agree, by execution of this Letter of Intent, that the provision of such personnel and Company's payment therefor, shall be governed by the terms and conditions of: (i) The proposed Contract No. MS04DTXX; (ii) Contractor's Proposal and all mutually agreed upon clarifications and/or revisions thereto; and (iii) the final resolution of Contractor's exceptions, if any, to the new Contract.
>
> This Letter of Intent shall remain effective until May 28, 2004 by which time a Contract shall be fully executed. Until such time as the new Contract has been fully executed, the maximum amount payable by Company to Contractor shall not exceed U.S. $50,000.00 without the prior written approval of Company. *In the event* the Contract is not executed on or before May 28, 2004 *and this Letter of Intent is not extended by Company*, then Contractor shall cease all work and turn over all work in progress to Company.
>
> Subject to the above, and upon proper signature below, this Letter of Intent shall serve, in advance of a fully executed Contract, as Contractor's authorization to proceed with the scope of work effective Monday, May 10, 2004.

(Emphasis added by italics, underlining in original).

warranties, the return of materials, and the payment of reimbursable expenses in the event of termination.

The Letter of Intent stated that Marathon intended to award a contract to Cherne subject to several contingencies. Relevant to the present appeal, these contingencies included Cherne's future agreement with Marathon as to a cost estimate, determination of a scope of work to Marathon's satisfaction, and the parties' execution of a final written contract. Cherne agreed in the Letter of Intent to begin work on the project prior to the parties' execution of the final contract.

The Letter of Intent authorized Cherne to begin limited pre-turnaround work for up to $50,000. As the original deadline listed in the Letter of Intent approached, the parties had not yet finalized their agreement and had not executed a written contract. In a first addendum dated May 26, the parties raised the cap on permissible work to $100,000 and extended the deadline to June 14. In a second addendum dated June 14, the parties raised the cap on permissible work to $1,253,660, extended the deadline to June 30, and extended the permissible work under the Letter of Intent in accordance with a June 14 email between the parties. That email referenced structural steel erection and an "Indirect Mobilization Estimate." In the email, as in the original Letter of Intent, Cherne acknowledged that the parties had yet to determine an overall project scope, stating, "Upon determination of total project scope, we will perform a control estimate for project indirect costs which will be inclusive of the indirect mobilization costs outlined above." In a third addendum dated July 1, the parties extended the deadline to July 23 without further extending the financial cap or the description of permissible work as referenced in the second addendum. The third addendum provided:

> It is agreed that [Marathon] will be directly involved with [Cherne's] planning efforts in terms of manpower loading, [Cherne's] staffing, equipment rentals, and temporary facilities. Further, the indirect mobilization estimate will need to be reviewed in detail and approved by

[Marathon] as the overall Pre-Turnaround and Turnaround Planning efforts are finalized.

Upon proper signature below, this Addendum No. 3 shall serve, in advance of a fully executed Contract, as [Cherne's] authorization to continue progressing the Scope of Work.

It is undisputed that the Letter of Intent and its addenda served as a valid contract governing the parties' relationship between May 14, 2004, and July 23, 2004. Each addendum stated that, except for the express revisions, the terms and conditions of the Letter of Intent remained in force. After July 23, Cherne continued performing revamp work for Marathon, and Marathon continued paying Cherne for the revamp work. Cherne's work for Marathon substantially exceeded the financial cap of the second addendum, and Marathon continued to pay Cherne amounts in excess of that financial cap. The parties continued their relationship in this manner until September 13, 2004, when Marathon's Project Manager sent a letter to Cherne terminating their working relationship effective September 17, 2004.

After receiving the termination letter, Cherne responded by letter dated September 24, 2004, notifying Marathon that Cherne would be returning or delivering materials to Marathon. Cherne stated that it was returning materials with the understandings "[t]hat [Marathon] agrees that upon turnover of the Materials to [Marathon], Cherne will have fully completed its material turnover responsibilities related to the contract[,]" that Marathon would pay certain already-submitted invoices, "[t]hat, as Cherne submits its remaining invoices related to the Contract, [Marathon] will continue to review and process such invoices in good faith," and that Cherne was providing materials to Marathon with no warranties or representations as to the condition of the materials.

Ultimately, Marathon paid almost all of Cherne's pre-termination and post-termination invoices, totaling over $2,000,000. Marathon, however, refused to reimburse Cherne for approximately $25,000 in severance payments that Cherne had

paid to select employees after Marathon's termination. Marathon also refused to pay Cherne for approximately $13,000 in lease-breakage fees.

Cherne filed the present action in December 2004. Notwithstanding Cherne's statements in its September 24 letter referring to specific "material turnover responsibilities related to the contract," Cherne alleged that, after July 23, 2004, the parties' relationship was no longer governed by the Letter of Intent, the termination clause of the draft agreement as incorporated by express reference within the Letter of Intent, or any written agreement with specific conditions regarding termination or material-turnover responsibilities. Rather, Cherne argued that the parties had entered into an oral or implied contract that could not be terminated without cause. Cherne argued it was entitled to, *inter alia*, expectation damages in the form of over $1.5 million in profits it believed it would have received if it had performed all pre-turnaround and turnaround work. In the alternative, Cherne argued promissory estoppel and unjust enrichment, alleging that it had provided Marathon a discounted rate in expectation of a greater scope of work.

Marathon moved for summary judgment. The district court granted Marathon's motion, finding that the parties, by their conduct, had modified and extended the Letter of Intent and that the Letter of Intent authorized Marathon to unilaterally terminate the relationship without cause. The district court noted that the parties agreed that their conduct established a contract following the July 23, 2004 deadline, and that the parties only disputed the terms of that contract. The court found, "Although the scope of and expenditures for Cherne's work exceeded the Letter's terms, the parties' conduct established their mutual assent to the modification of those terms." The court proceeded to conduct an analysis of the termination provisions of the draft agreement as incorporated into the Letter of Intent and held that Marathon retained the right to terminate the relationship with Cherne. Finally, the district court rejected the promissory estoppel and unjust enrichment theories as inconsistent with

the parties' position (and the court's finding) that a contract governed their relationship.[4]

## II.    Discussion

We review a grant of summary judgment de novo. In re: Minn. Mut. Life Ins. Co. Sales Practices Litig., 346 F.3d 830, 833–34 (8th Cir. 2003). The parties agree that Minnesota contract law governs in this case. Minnesota law provides that a court is to determine whether a written contract is ambiguous, and if it is unambiguous, the court is to construe the contract as a matter of law. Denelsbeck v. Wells Fargo & Co., 666 N.W.2d 339, 346 (Minn. 2003) ("The construction and effect of a contract is also a question of law unless the contract is ambiguous."); Art Goebel, Inc. v. N. Suburban Agencies, Inc., 567 N.W.2d 511, 515 (Minn. 1997) ("The determination of whether a contract is ambiguous is a question of law for this court to decide."). In determining whether a written contract is ambiguous, the court is not to give words cramped, unnatural, or out-of-context readings but to assess "the meaning assigned to the words or phrases in accordance with the apparent purpose of the contract as a whole." Art Goebel, 567 N.W.2d at 515. Further, "when the intention of the parties to a contract is ascertainable from the writing, construction is for the court." LaSociete Generale Immobiliere v. Minneapolis Cmty. Dev. Agency, 44 F.3d 629, 636 (8th Cir. 1994).

If reference to disputed extrinsic facts is required to resolve an ambiguity in a contract, a jury is to determine the relevant facts. See Turner v. Alpha Phi Sorority House, 276 N.W.2d 63, 66 (Minn. 1979) ("The construction and effect of a contract are questions of law for the court, but where there is ambiguity and construction

---

[4]In a separate order, the district court held that Marathon was liable to Cherne under the Letter of Intent for the contested severance payments and the lease-breakage fees but not liable for certain invoices Cherne had failed to submit. In addition, the district court determined Marathon was entitled to a credit for an accounting error that Cherne discovered and disclosed.

depends upon extrinsic evidence and a writing, there is a question of fact for the jury."). Also, a jury is to decide material questions of fact regarding the existence or terms of an oral or implied contract. See Bergstedt, Wahlberg, Berquist Assocs., Inc. v. Rothchild, 225 N.W.2d 261, 263 (Minn. 1975) ("Whether a contract is to be implied in fact is usually a question to be determined by the trier of fact as an inference of facts to be drawn from the conduct and statements of the parties."). That is not to say, however, that the existence of disputed terms in oral or implied contracts, or ambiguities in written contracts, necessarily preclude summary judgment. Rather, as with the analysis for summary judgment in any case, where no reasonable jury could find the facts necessary to entitle a plaintiff to relief, summary judgment remains appropriate. See Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986) (stating that summary judgment is appropriate where there is no dispute as to a material fact).

Here, undisputed facts demonstrate that the parties established a contract by their conduct following July 23, 2004, and that the resulting contract was an extension of the written Letter of Intent. Further, we find that the terms of the Letter of Intent unambiguously grant Marathon termination rights. Accordingly, we agree with the district court that the Letter of Intent continued to govern the parties' relationship after July 23, 2004, and that Marathon properly terminated the relationship consistent with its rights as set out in the Letter of Intent.

A.    Conduct of the Parties

Several aspects of the parties' conduct following July 23, 2004, support the inference that the parties impliedly extended and modified the Letter of Intent. See Fischer v. Pinske, 243 N.W.2d 733, 735 (Minn. 1976) (holding that continuation of a business relationship without material change after expiration of contract resulted in extension of original contract); see also House v. Baxter, 371 N.W.2d 26, 29–30 (Minn. Ct. App. 1985) (reversing and remanding with instructions to consider whether post-expiration conduct demonstrated an intent to impliedly extend terms of original

contract).  Initially, we note that neither party materially changed its course of performance after the Letter of Intent's stated expiration date.  The only aspects of performance that arguably were inconsistent with the Letter of Intent and its addenda were the scope of, and financial cap upon, Cherne's work; Cherne's work and Marathon's payment exceeded that described in the Letter of Intent and its written addenda.  Given the series of three written addenda preceding July 23, however, the parties had already established a pattern of extending the scope and scale of their time and materials relationship in the absence of a final written agreement.

By its express terms, the Letter of Intent required Cherne to cease work and return materials to Marathon only if the deadline for execution of a contract passed *and* if Marathon failed to extend the Letter of Intent.  <u>See</u> Letter of Intent, <u>supra</u> n.3 (emphasized provisions).  The Letter of Intent did not specify a particular means for Marathon to extend the Letter of Intent, but it clearly gave Marathon the right to extend.  We can discern no basis for viewing Marathon's continued performance and acceptance of Cherne's continued, unaltered performance as anything other than an extension of the Letter of Intent.

Second, after Marathon terminated the parties' relationship, Cherne expressly referenced the written termination provisions from the draft contract as incorporated into the Letter of Intent, returned materials in accordance with these provisions, and disclaimed any warranties, as per these provisions.  Cherne stated expressly in its September 24, 2004 letter that it was returning materials to fulfill its "material turnover responsibilities related to the contract."  In the district court and on appeal, Cherne offers no explanation as to what it was referencing in the September 24 letter if not the Letter of Intent and the termination provisions incorporated therein.

As explained below, Cherne made clear at oral argument that it is asserting the existence of an implied or oral contract largely void of any detailed terms addressing such fine matters as "material turnover responsibilities."  Accordingly, not only is Cherne's reference in the September 24 letter consistent with extension of the Letter

-10-

of Intent and its incorporated termination provisions, it is inconsistent with the simple, unadorned contract Cherne urges us to find in the record.

Finally, Cherne submitted invoices seeking payment and in fact received payment for services rendered, as per the April 29 Proposal incorporated into the Letter of Intent and as per its pre-July 23 conduct. Not until long after termination and after pursuing a course of conduct consistent with continued applicability of the Letter of Intent did Cherne eventually assert a claim for over $1.5 million in expectation damages based on an alleged promise of 170,000 worker-hours of labor and attendant material sales. While we do not suggest that Cherne is somehow estopped from presenting its current theory, it is difficult to appreciate how a reasonable jury might find the existence of this type of guaranteed contract for hours in light of Cherne's compliance with, and reference to, the Letter of Intent in September 2004.

In sum, the parties' conduct points solely toward the conclusion, as reached by the district court, that the parties intended the Letter of Intent to continue governing their relationship after July 23 and in the absence of a final written agreement. Even if the record were amenable to a different interpretation, nothing that Cherne identifies suggests that the parties, at any time, contemplated a requirement that termination be allowed only for cause. See, e.g., House, 371 N.W.2d at 30 ("There is no evidence of the parties' conduct following [the expiration date] which implies a contract to require cause.").

B.    Cherne's Position as to Post-July 23, 2004 Contract Terms

In its opinion, the district court stated in a footnote that several statements and communications cited by Cherne as support for a contract with a greater scope of work did not "establish the necessary offer evidencing Marathon's willingness to be bound by such a term or acceptance of such a term by Cherne." On appeal, Cherne relies upon these several statements as well as deposition testimony from three

Marathon employees to support its position. We address below the terms of the contract Cherne asks us to find as well as those elements of the record that Cherne cites as support for its position.

At oral argument, Cherne clarified what it alleged to be the terms of a new, post-July 23 agreement with Marathon. Cherne identified only three terms: (1) commercial terms covering a reimbursement mark-up rate for time and materials; (2) a completion date; and (3) a scope of work including all pre-turnaround and turnaround work for the project. As noted above, the parties' conduct belies Cherne's assertion that these three terms alone governed the parties' relationship because Cherne expressly referenced the written materials-return provisions in its September 24 letter and because no such detailed terms would exist under Cherne's theory of a three-point, unwritten contract.

Regarding a reimbursement rate for time and materials, Cherne points to the commercial terms of the April 29 Proposal. The Letter of Intent, however, incorporated these terms by reference. As such, Cherne's assertion in no manner distinguishes between continued applicability of the Letter of Intent and applicability of a different agreement. Accordingly, identification of these terms does not distinguish or elevate Cherne's purported three-issue agreement relative to the terms of the Letter of Intent.

Regarding completion date and scope of work, these terms are, in reality, merely separate labels for one concept. Cherne's theory of the case is that Marathon guaranteed an award of all project work to Cherne—pre-turnaround as well as turnaround work, with pre-turnaround work to be completed prior to the refinery turnaround and with turnaround work to be completed by the end of the refinery turnaround. To argue that Marathon had awarded Cherne the turnaround work is, by the parties' definition of turnaround, the same as arguing the parties had agreed that Cherne would complete work by the end of the turnaround period. Cherne's alleged

-12-

three-point, unwritten contract, then, in reality contained only two terms, a scope of work and a reimbursement rate.

The evidence Cherne points to in support of its alleged scope of work and corresponding completion date includes several passages from deposition testimony and several communications between the parties or internal memoranda in which the parties referred to Cherne as the contractor for the project, discussed pre-turnaround and turnaround work, or referenced the award of a contract to Cherne. These items of evidence fall into three general categories: statements before, during, and after the May 14 to July 23 window of time during which the Letter of Intent undisputedly governed the parties' relationship.

The statements and documents predating the Letter of Intent or its addenda cannot create a triable question of fact regarding the parties' intent to the extent they are inconsistent with the parties' clear expressions of intent in the Letter of Intent and its addenda regarding termination without cause and regarding the undefined nature of the overall scope of work. The Letter of Intent unambiguously shows that Marathon and Cherne understood that Marathon was allowing Cherne to commence work on site on a reimbursable basis with an overall scope of work and overall project cost estimate yet to be determined. Cherne reaffirmed the unsettled nature of the scope of work in the addenda that again referred to the scope of work as unsettled. As per the Letter of Intent, these items were both contingencies that the parties had to agree upon before entering into a final contract. Cherne, therefore, cannot now successfully argue that the parties had agreed to a complete scope of work or cost estimate prior to the dates on which the parties signed the Letter of Intent and its addenda stating that these points remained unresolved.

That is not to say that the parties had not communicated about the potential, overall project scope or the possibility of employing Cherne to perform turnaround as well as pre-turnaround work. The Letter of Intent and its addenda simply show that Marathon had not agreed to bind itself to guarantee such work for Cherne.

-13-

Throughout negotiations, the parties continued to communicate planning efforts, exchange scheduling and manpower requirements, and share other information as necessary to lay the groundwork for Cherne to perform work for Marathon.

As explained below, statements that Cherne cites from the period of time after July 23 address these issues and merit greater attention. When viewed in context, however, all of the post-July 23 statements that Cherne cites simply illustrate the fact that the parties were working towards the employment of Cherne as the contractor for the project. The Letter of Intent itself anticipated these communications, and the statements do not establish that the parties actually reached a final agreement. Further, none of these statements suggest any departure from the clearly expressed intent in the Letter of Intent (and incorporated provisions from the draft agreement) to permit termination without cause. See, e.g., House, 371 N.W.2d at 30 ("Even without an implied extension of the written agreement, the prior written agreement is evidence of intent of the [parties] that termination was to be without cause.").

Cherne points to the following sources of support for its position: (1) July 29 internal emails between Marathon's Project Execution Manager Patrick Lysaght and Marathon's Project Manager John Stefko purportedly identifying Cherne as project manager for turnaround phase work; (2) an August 9 document entitled "updated Contracting Strategy" in which Marathon stated, "Cherne will complete the mechanical pre-turnaround and turnaround scope in Complex I"; (3) an August 23, 2004 "Subcontracting Control Plan" identifying Cherne as the Crude/VAC, Mechanical, Electrical, Instrumentation, and Insulation Pre-Turnaround and Turnaround 2004 Contractor; (4) a Milestone Schedule prepared by Marathon identifying a delayed "Turnaround Completion Date" of March 18, 2005 and a Contract Award date of May 10, 2004; (5) a Cherne email dated August 6 discussing planning for turnaround activities; (6) deposition testimony of Marathon Project Contracts Administrator Robert Guilmette, Patrick Lysaght, and John Stefko.

The first five of these documents (not all of which were communicated to Cherne prior to discovery in this case) verify the undisputed facts that Marathon and Cherne commenced their relationship anticipating that Cherne might be able to provide extensive pre-turnaround and turnaround project services to Marathon and that Marathon and Cherne negotiated, communicated, and planned schedules in order to keep this possibility open. None of these documents demonstrate the existence of a contract under which Marathon agreed to bind itself to Cherne subject to termination only for cause. In fact, several support Marathon's current position that the parties were still attempting to agree upon a cost estimate and overall scope of work after July 23.

The July 29 email simply demonstrates that, as late as July 29, Marathon was still trying to establish cost estimates for the project. The only references to Cherne in this document are the name "Cherne" in parentheses under the header "Crude Shutdown" and the statement, "We should use these total hour values to split the Cherne and [other contractor] costs." Similarly, the August 9 and August 23 documents list several projects and contractors Marathon considered to be assigned to those projects. Nothing about these or the remaining documents, however, suggests that Marathon had, in fact, guaranteed work for Cherne or any of the other contractors or entered into unwritten contracts precluding termination without cause.

The failure of these documents to support Cherne's current position is illustrated most fully by the fact that one of these documents, a "Milestone Schedule," refers to May 10, 2004, as a "Contract Award" date. May 10, 2004, in fact, was the day a Marathon representative signed the Letter of Intent (which a Cherne representative subsequently signed on May 14). A Marathon document listing May 10, 2004, as a "Contract Award" date, then, simply cannot support Cherne's current position that the parties, on May 10, had entered into a final agreement with terms different from the Letter of Intent.

Finally, the last-referenced document is an email merely showing that Marathon was moving and shortening the dates for the refinery turnaround and checking with Cherne about the feasibility of such a move. While this document shows that Marathon anticipated Cherne would be performing further pre-turnaround work and turnaround work, it does not show that Marathon had agreed to any terms contrary to those within the Letter of Intent.

At oral argument, Cherne characterized the deposition testimony of Marathon's personnel as unequivocally establishing that the parties had entered into a verbal agreement after July 23, 2004, guaranteeing all project work for Cherne subject only to termination for cause. The deposition testimony cannot reasonably be understood as supporting Cherne's characterization. Marathon employees Guilmette, Lysaght, and Stefko all testified that Marathon's generally preferred approach is to use one contractor for pre-turnaround and turnaround work. They also stated that Marathon and Cherne talked about having Cherne perform pre-turnaround and turnaround work. None of them, however, testified that Marathon had ever entered an agreement guaranteeing such work for Cherne.

In fact, in the passages Cherne cites in its brief as support for the existence of a verbal agreement, the only statement that might be interpreted as a verbal agreement of any kind is found in a recitation of hearsay by Guilmette. Guilmette claimed that Marathon's project manager Stefko had agreed with Cherne's president that the pre-turnaround work would be an "audition" for a possible award of turnaround work. To the extent, then, that Cherne relies upon the Marathon employees' characterization of the relationship to prove a contract with terms different than the Letter of Intent, Cherne's efforts fail.

C.    Equitable Theories of Relief

Because the district court correctly concluded that the Letter of Intent, as modified and extended, governed the parties' relationship, the district court correctly granted summary judgment on the alternative claims for equitable relief. The claims for equitable relief were inconsistent with the district court's conclusion that a valid contract governed the parties' relationship. See Martens v. Minn. Mining & Mfg. Co., 616 N.W.2d 732, 746 (Minn. 2000) ("Promissory estoppel is an equitable doctrine that implies a contract in law where none exists in fact." (quotation omitted)). Further, even if equitable relief were potentially available, Cherne's failure to prove a definite promise by Marathon regarding a scope of work would preclude equitable relief just as it precludes Marathon's contract theory. Id. (listing a "clear and definite promise" as an element of promissory estoppel).

We affirm the judgment of the district court.

_____