**John A. MARTENS, et al., Respondents,**

v.

**MINNESOTA MINING & MANUFACTURING COMPANY, petitioner, Appellant.**

No. C0–98–2303.

Supreme Court of Minnesota.

Sept. 21, 2000.

Rehearing Denied Oct. 30, 2000.

Dorsey & Whitney LLP, Thomas Tinkham, Peter S. Hendrixson, Robert R. Reinhart, James M. Zappa, Minneapolis, Carol, A Peterson, St. Paul, for appellant.

Sprenger & Lang PLLC, Lawrence P. Schaefer, James R. Behrenbrinker, Lisa C. Stratton, Minneapolis, Paul C. Spenger, Michael D. Lieder, Maia Caplan, Washington, D.C., for respondents.

Eric Magnuson, Rider Bennett Egan & Arundel, Minneapolis, for amicus curiae Minnesota Chamber of Commerce and the Minnesota Business Partnership.

## OPINION

STRINGER, Justice.

Respondents John A. Martens and Gerald J. Niles, two long-term technical employees of appellant Minnesota Mining and Manufacturing Company (appellant) allege that appellant's written and oral statements regarding a dual ladder system for compensating and promoting technical employees were sufficiently definite to constitute an offer for a unilateral contract and a promise enforceable under a promissory estoppel theory. They further allege that appellant's statements were made with no intention of fulfilling them and were therefore fraudulent misrepresentations. Appellant moved for dismissal pursuant to Rule 12.02(e) of the Minnesota Rules of Civil Procedure, asserting that the complaint fails to state a claim upon which relief can be granted. The district court dismissed the promissory estoppel and fraud claims but denied appellant's motion as to the breach of contract claim. The court of appeals affirmed as to the breach of contract claim ruling but reversed the dismissal of the claims relating to promissory estoppel and fraud. We reverse the court of appeals' rulings on all claims and remand for the entry of an order dismissing the complaint.

At the heart of respondents' complaint is the dual ladder program, designed and developed by appellant in the 1950's to recruit and retain technical employees by providing opportunities for advancement for those who choose to pursue their career in a purely technical environment rather than in the corporation's administrative structure. Respondents rely in their complaint on appellant's brochures entitled *The Technical Dual Ladder System–Parallel Paths of Progress, Parallel Technical Career Paths,* and *Laboratory Careers,* and an article published in the company newspaper the *3M Stemwinder* as well as oral statements made to respondents by various individuals at the company as the foundation for their theories of recovery. The brochures appellant distributed to its employees and prospective employees describe the dual ladder as "a worldwide organizational framework within which members of the 3M technical community may realize career development in either management or in the continued pursuit of their technical interests." [1]

---

1. Minnesota Mining & Manufacturing, Co., *The Technical Dual Ladder System–Parallel* *Paths of Progress* (1981) (brochure).

In 1981 appellant distributed a brochure entitled *The Technical Dual Ladder System–Parallel Paths of Progress*, explaining the purpose of the dual ladder:

[I]t is the Company's intent that responsibility, recognition and reward for their progress be equivalent [on both sides of the ladder] – yet recognizing they can't be identical.

To the administrator, a secretary and office serve a functional purpose. To the administrator's counterpart in research, development, or engineering, freedom to delve into a field of special interest – substantially unfettered by management responsibilities and formalities – has balancing value.

* * * It is the Company's intent that promotion on either side of the Dual Ladder be accompanied by the challenge of added responsibility and, when these challenges are met, by the rewards of appropriate recognition.

The Dual Ladder concept is a dynamic one, one that is rich in potential for both the individual and the Company. Not restricted by rigid procedures, it offers an evolving program that will grow as participation in it expands.

The brochure notes that the plan provides "outstanding technical people with suitable and meaningful forms of recognition and advancement, within a compensation framework comparable to that of administrative positions." Further, it explains that the system was not premised upon identical results: "[W]orkability * * * [of the system] cannot be contingent upon **identical** recognition and rewards. This would not only be unrealistic, but contrived. The key is **equivalence**—an equitable **balance** that provides meaningful motivation."

The brochure also describes the steps of the dual ladder. The first step on the technical side is specialist, equivalent to supervisor on the administrative side, according to the brochure. The second step is senior specialist, the equivalent of manager. The third step is division/staff scientist or engineer, the equivalent of laboratory manager, and the fourth step is corporate scientist or engineer, the equivalent of technical director.

In 1994 the company newspaper the *3M Stemwinder* published an article regarding the dual ladder program and referred to a corporate scientist's statement that results in terms of salaries, opportunities and recognition are equivalent on either side of the ladder. About the same time, appellant distributed a promotional brochure entitled *Parallel Technical Career Paths* featuring several prominent scientists and engineers employed by appellant, including respondent Martens. The brochure states that the dual ladder allows technical employees to "continue making significant **technical** contributions to the corporation—without sacrificing recognition or rewards" but that advancement along the ladder depends upon job performance: "Progress along either side of the 3M Dual Ladder is based upon continuing demonstration of increased proficiency and performance." It also states that employees have "flexibility to switch–without penalty" between sides of the ladder.[2]

Recently appellant published another brochure relating to the dual ladder entitled *Laboratory Careers*. It describes the program's objective of assisting "the technical employee, individually or in communication with management, in clarifying career goals, as well as to provide information to those considering career options in the technical field." It states: "For equivalent levels, pay grades and benefits are

2. The description of the steps in the ladder in *Parallel Technical Career Paths* differs somewhat from the earlier brochure. It lists seven positions on the technical side – entry level (B.S.), advanced (M.S.), senior (Ph.D.), specialist, senior specialist, division or staff scientist or engineer, and finally corporate scientist or engineer. The administrative side begins with supervisor, equivalent to specialist, and culminates at technical director, equivalent to corporate scientist or engineer.

the same on both sides of the dual ladder." In place of steps, however, *Laboratory Careers* describes career phases on the dual ladder. The first phase in a technical career is individual contributor, which does not have an administrative equivalent; the second phase is specialist on the technical side and supervisor on the administrative side; the third is senior specialist, division scientist or engineer on the technical side and manager on the administrative side; and the fourth is corporate scientist or engineer on the technical side and technical director on the administrative side. The brochure lists "possible job positions" within these phases and assigns employment levels to each phase--that is, T1 to T3 for individual contributors, T4 for specialists and supervisors, T5 and T6 for senior specialists, division scientists and engineers, and managers, and T7 for corporate scientists, corporate engineers, and technical directors. The brochure notes that "[m]any employees may not move through all of the phases" and moving to another phase requires "significant accomplishments within the current phase and developing the trust and support of key people * * *."

Respondents' suit against appellant[3] filed in May 1998, alleged breach of contract, promissory and equitable estoppel, breach of the covenant of good faith and fair dealing, fraudulent misrepresentation, retaliation in violation of Minn.Stat. § 181.932 (1998), and defamation and disclosure of confidential information.[4] As to breach of contract, respondents claimed that oral and written statements regarding the dual ladder program constituted a unilateral offer communicated to respondents and that respondents accepted it by becoming employees and continuing their employment. Respondents alleged that appellant breached its contract with them

by compensating technical employees at lower salary levels than administrative employees and providing Performance Unit Plan awards only to administrative employees at the technical director level. As to respondent Martens specifically, he further alleged that appellant breached its contract with him by limiting compensation for corporate scientists to grade 18. Respondent Niles further alleged that appellant breached its contract with him when it implemented a "headcount policy" limiting the number of technical promotions and restricted movement to the administrative side of the ladder.

Respondents' claim of promissory estoppel alleged that appellant made promises to them with the purpose of inducing them to join and remain employees, that they relied upon these promises and that appellant did not fulfill them. As to their fraud claim, respondents alleged that appellant made representations of fact regarding the dual ladder system knowing they were untrue or with deliberate disregard of their truth or falsity.

Respondent Martens alleged that when the complaint was filed he had been employed by appellant for nearly 30 years and had achieved the corporate scientist level, the highest position on the technical side of the ladder; that in 1968 following his graduation from college with a degree in chemical engineering the dual ladder program was an inducement to his accepting employment with appellant and that he remained at the company in reliance on appellant's representations regarding the program; that he is an accomplished employee holding 20 patents that have led to many successful product lines for appellant and in 1987 he was the youngest scientist to be elected to appellant's honorary Carlton Society; and that when a manager

---

**3.** Respondents sued on behalf of a class of similarly situated employees pursuant to Rule 23 of the Minnesota Rules of Civil Procedure. There has been no determination of the class allegation.

**4.** Our review here is only as to claims relating to breach of contract, promissory estoppel and fraudulent misrepresentation. The other claims alleged in the complaint were all dismissed by the district court and respondents did not appeal their dismissal.

recommended him for a promotion to level T4 in 1973, the manager told Martens and wrote in a performance review that if he eventually achieved a promotion to the corporate scientist position, salary and compensation would be "open ended" or "without limit." Martens further alleged that these representations were repeated by various managers orally and in company documents and that he relied on them in deciding to remain in appellant's employment.

Martens was promoted to corporate scientist in 1991 and as of 1996 his salary was $127,418, in the first quartile of salary grade 18. He claimed that in 1997 a technical director told him that appellant had a policy of limiting compensation for corporate scientists to the first quartile of grade 18 but that later the technical director wrote a memo to him confirming that corporate scientists may in fact earn a salary in a grade higher than 18. Martens further alleged that most corporate scientists earn incomes at the lower end of salary grade 18, but on the administrative side of the ladder many directors earn incomes at the upper end of grade 18 and one-third to one-half are paid at or above grade 19.

Respondent Niles alleged he had worked for appellant for 34 years at the time of the filing of the complaint and was employed as a Technical & Manufacturing Specialist at the T4 level; that he accepted employment with appellant in 1963 after his graduation from high school and that he made significant contributions as an employee holding 25 patents and that his work was integral to the development of several successful product lines. In 1993 he received an Emmy for Outstanding Engineering Developments from the Academy of Television Arts and Sciences and in 1994 was recognized as one of the Inventors of the Year by the Minnesota Inventors' Congress. Niles further alleged that he was told by various company managers that promotions up the dual ladder depended not upon degrees but upon performance. In reliance on these statements he

remained at the company and did not pursue higher education. He was promoted to the T4 level in 1995 and beginning in 1996 he was responsible for the technology underlying the development of a packaging program. Niles claimed that this project represented T6 level work. After requesting a promotion, Niles alleged that a director spoke with a vice president on his behalf and was told that Niles would have "no chance" to advance further up the technical side of the ladder. Niles' efforts to transfer to the administrative side of the dual ladder were unsuccessful.

Niles alleged that appellant did not promote him because technical promotions are restricted by a "headcount" policy permitting only a limited number of technical employees to advance into higher positions, but that similar restrictions do not apply to promotions on the administrative side of the ladder. He also alleged that appellant limits movement between the technical and administrative sides of the dual ladder contrary to its representations.

Both respondents Martens and Niles further alleged that appellant provides additional compensation to administrative employees through the Performance Unit Plan, which directs performance-related compensation to key personnel, and in 1991 awarded over $19 million to 155 individuals. They also alleged that no technical employee has ever participated in this plan.

In response to appellant's motion to dismiss respondents' complaint pursuant to Minnesota Rule of Civil Procedure 12.02(e) for failure to state a claim, the district court dismissed all counts except breach of contract. The court held that respondents stated a breach of contract claim upon which relief can be granted because appellant's statements were sufficiently definite to constitute an offer for a unilateral contract, the offer was communicated to respondents through appellant's oral statements and distribution of various written materials prepared by appellant, and respondents accepted the offer by becoming

or remaining employees of appellant. The court dismissed respondents' promissory estoppel claim on the theory that because it allowed respondents' contract claim to go forward, justice did not require the promissory estoppel claim to also be litigated. Further, the court dismissed respondents' fraud claim on the basis that there was no allegation appellant made a representation of past or present fact susceptible of knowledge.

The district court certified the breach of contract claim as important and doubtful pursuant to Rule 103.03(h) of the Minnesota Rules of Civil Appellate Procedure.[5] As to respondents' other claims, the district court determined there was no just reason for delay and ordered the entry of judgment pursuant to Rule 54.02 of the Minnesota Rules of Civil Procedure. The court of appeals dismissed the appeal of the breach of contract claim concluding that the district court failed to properly identify the legal question to be reviewed and failed to make specific findings as to the importance of the question.

When respondents appealed the dismissal of the promissory estoppel and fraud claims, appellant appealed the denial of its motion to dismiss the breach of contract claim pursuant to Rule 106 of the Minnesota Rules of Civil Appellate Procedure.[6] The court of appeals reversed the district court's dismissal of the promissory estoppel claim holding that respondents stated a claim because it was proper to plead promissory estoppel and breach of contract alternatively and the issue of reasonable re-

liance was a question of fact for the jury. *See Martens v. Minnesota Mining & Mfg. Co.,* No. C0–98–2303, 1999 WL 366614, at *2 (Minn.App. June 8, 1999). The court also concluded that respondents stated a claim upon which relief can be granted as to fraud because appellant's state of mind as to whether it intended to fulfill its representations when it made the alleged statements was a fact susceptible of knowledge. *See id.* at *3. Finally, the court affirmed the trial court in denying the motion to dismiss the breach of contract claim, concluding that whether appellant's statements constituted a unilateral offer definite in form and communicated to the respondents was a question of fact for the jury. *See id.* at *4. The court viewed the definiteness of the offer and its communication to the offeree as a single issue. *See id.*

## I.

### Rule 12.02(e) Motion.

 A Rule 12.02(e) motion raises the single question of whether the complaint states a claim upon which relief can be granted.[7] *See* Minn. R. Civ. P. 12.02(e); *see also Royal Realty Co. v. Levin,* 244 Minn. 288, 290, 69 N.W.2d 667, 670 (1955). We have held it is immaterial whether or not the plaintiff can prove the facts alleged, *see Royal Realty Co.,* 244 Minn. at 290, 69 N.W.2d at 670, and we will not uphold a Rule 12.02(e) dismissal "if it is possible on any evidence which might be produced, consistent with the pleader's

---

**5.** Rule 103.03 states: "An appeal may be taken to the Court of Appeals:

\* \* \* \*

(h) if the trial court certifies that the question presented is important and doubtful, from an order which denies a motion to dismiss for failure to state a claim upon which relief can be granted or from an order which denies a motion for summary judgment \* \* \*."

Minn. R. Civ.App. P. 103.03.

**6.** Rule 106 states: "A respondent may obtain review of a judgment or order entered in the same action which may adversely affect re-

spondent by filing a notice of review with the clerk of the appellate courts." Minn. R. Civ. App. P. 106.

**7.** If a court evaluates materials outside the pleadings in considering a Rule 12.02(e) motion, the motion must be treated as one for summary judgment. *See* Minn. R. Civ. P. 12.02. Here the district court considered only the statements pled in the complaint. Therefore, we limit our review to the particular documents and oral statements referenced in the complaint.

theory, to grant the relief demanded[,]" *Northern States Power Co. v. Franklin*, 265 Minn. 391, 395, 122 N.W.2d 26, 29 (1963).[8]

## II.

### Unilateral Contract.

Respondents argue that appellant's statements regarding the dual ladder program constitute an offer for a unilateral contract, that appellant communicated this offer to them by making statements and distributing materials regarding the dual ladder, and that the offer was accepted by respondents becoming or remaining employees of appellant. Respondents also argue that the existence of a unilateral offer presents a question of fact and is thus not appropriately decided on a Rule 12.02(e) motion. Appellant contends that its statements, verbal and written, were not sufficiently definite to constitute an offer and that this, as a threshold issue, is a question of law to be determined by the court.

■■■ Turning first to the important question of whether the making of a unilateral offer is an issue of fact or of law, clear precedent holds that regardless of whether the claim is based on oral or written statements, or a combination of both, it is a question of law to be resolved by the

court.[9] In *Ruud v. Great Plains Supply, Inc.*, we held as a matter of law that oral statements allegedly made by the plaintiff's employer were too indefinite to form an offer for a unilateral contract and were only general statements of policy. 526 N.W.2d 369, 372 (Minn.1995). Similarly, in *Hunt v. IBM Mid Am. Employees Fed. Credit Union* we concluded that whether language in an employee manual rose to the level of a contract was a question of law.[10] 384 N.W.2d 853, 856 (Minn.1986); *see also Ex parte Graham*, 702 So.2d 1215, 1221 (Ala.1997) (stating that whether employee handbook was sufficiently definite to form an offer for a unilateral contract was a question of law).

■■■ Regardless of whether the terms of the alleged offer are contained in one or several documents, our obligation is to review the complaint as a whole, including the documents upon which respondents rely, to determine whether as a matter of law a claim has been stated. We cannot reject a party's right to dismissal of a suit based merely on the suit's complexity, as the dissent suggests. We therefore address as an issue of law whether appellant's alleged statements constitute a unilateral offer.[11] Our review is de novo. *See Hibbing Educ. Ass'n v. Public Employment Relations Bd.*, 369 N.W.2d 527, 529 (Minn.1985).

8. The dissent misconstrues the foundation of the court's ruling when it asserts that dismissal of the complaint is "because we may decide that there are no issues of fact to be decided." The scope of our review rests solely on the provisions of Minn. R. Civ. P. 12.02(e) and related case law cited above.

9. Where the issue is whether in fact the employer made a statement at all, a jury issue is of course presented. *See, e.g., Dietz v. Dietz*, 244 Minn. 330, 332, 70 N.W.2d 281, 284 (1955) (whether oral promise was made was question of fact). But because we assume the allegations of the complaint are true for Rule 12.02(e) purposes, our only concern is whether as a matter of law the allegations constitute a unilateral offer.

10. Respondents rely on *Lewis v. Equitable Life Assurance Soc'y*, 389 N.W.2d 876 (Minn. 1986), as authority establishing that whether

a statement is sufficiently definite to constitute an offer for a unilateral contract is a question of fact reviewable on appeal under a clearly erroneous standard. We disagree. In *Lewis* we concluded that the meaning of the employee handbook language at issue was a question of fact but only because the trial court ruled the contract was ambiguous. *Id.* at 883. We did not address whether the preliminary issue of the existence of an offer is a question of fact or of law. *See id.*

11. Contrary to the dissent's assertions, we do not seek to discern the meaning of an employment contract between the parties but rather to determine whether appellant's alleged statements relating to the dual ladder system form an offer for a unilateral contract.

▮ In Minnesota employment is generally considered to be "at will," and in the absence of consideration given by the employee in addition to the employment services provided, either the employer or employee may terminate the employment at any time.[12] *See Skagerberg v. Blandin Paper Co.*, 197 Minn. 291, 294–95, 266 N.W. 872, 874 (1936). For example, in *Degen v. Investors Diversified Servs., Inc.*, even though the employee claimed the employer told him to "consider this a career situation, and not * * * as * * * temporary employment" and that he "shouldn't look forward to anything else other than a long career with the company," we held the evidence was "wholly inadequate" to establish a contract for lifetime employment. 260 Minn. 424, 425, 428, 110 N.W.2d 863, 864–66 (1961).

Similarly, in *Cederstrand v. Lutheran Bhd.* an employee claimed he had a unilateral contract permitting dismissal only for cause based on statements by the company president, made at a meeting of employees regarding a retirement program that "there would be no dismissals as long as people showed willingness to work and ability and wanting to learn" and that "there was chances [sic] for advancement and people could have a job as long as they wished until retirement." 263 Minn. 520, 523, 117 N.W.2d 213, 216 (1962). The employee also claimed reliance on a provision in a booklet regarding personnel policies that stated "[a] person is not dismissed without cause, and it is customary to give a warning and an opportunity to 'make good' before final dismissal." *Id.* at 523, 117 N.W.2d at 215–16. We noted that dismissal only for cause would place a significant limitation on an employer's right to terminate an employee and concluded that the president's statements did not "contain the indicia of intent to contract." *Id.* at 533, 117 N.W.2d at 222. We held the booklet was "only a collection of general policies, not an offer of contractual character." *Id.* at 534, 117 N.W.2d at 222.

Respondents rely heavily on our decision in *Pine River State Bank*, 333 N.W.2d at 622. In *Pine River* a bank brought suit against a former employee for payment on two notes and the former employee counterclaimed alleging an employment contract based upon provisions regarding disciplinary procedures and job security appearing in an employee handbook. *Id.* at 625. The employee had been terminated without warning due to irregularities in loan documents prepared by him. *See id.* The jury concluded that the parties had formed an agreement to terminate the employee only for good cause and that the bank had breached the agreement. *See id.* On the bank's appeal, we affirmed, holding that "personnel handbook provisions, if they meet the requirements for formation of a unilateral contract, may become enforceable as part of the original employment contract." *Id.* at 627. We determined that "[w]hether a proposal is meant to be an offer for a unilateral contract is determined by the outward manifestations of the parties, not by their subjective intentions" but we noted "[g]eneral statements of policy" are not contractual. *Id.* at 626. We stated that the presumption that employment contracts for an indefinite period create at-will employment relationships is only a rule of construction and does not limit freedom to contract between employers and employees and that the basis for a unilateral contract without additional consideration can relate to such matters as bonuses, severance pay or commission rates as well as "job security provisions." *Id.* at 628–29. We qualified our holding with a caveat however: "Not every utterance of an employer is binding. It remains true that the employer's prerogative to make independent, good faith judg-

---

12. To the dissent's concern that our analytical focus is on at-will employment, our case law relating to at-will employment constitutes the body of law that we apply to determine whether there has been a unilateral offer of employment. *See, e.g., Pine River State Bank v. Mettille,* 333 N.W.2d 622, 626–27 (Minn. 1983).

ments about employees is important in our free enterprise system." *Id.* at 630 (citation omitted).

The plaintiff in *Pine River* relied on two sections of an employee handbook—one entitled "Disciplinary Policy" set forth a three-stage procedure requiring reprimand for the first two offenses and suspension or discharge for a subsequent offense. *Id.* at 626. It provided that discharge should only occur if the employee's conduct did not improve and then only subsequent to a review of the facts by the Executive Officer. *See id.* The other section entitled "Job Security" described "in general, laudatory terms * * * the stability of jobs in banking." *Id.* We applied a four-part test to determine if the handbook provisions constituted a unilateral contract of employment: 1) did the employer make an offer definite in form; 2) did the employer communicate that offer to the employee; 3) did the employee accept the offer; and 4) did the employee furnish consideration. *See id.* at 626–27. We concluded that the section regarding disciplinary procedures was definite enough to constitute a unilateral offer to be bound by the dismissal procedure because it specifically set forth the procedures to be followed when terminating an employee and it applied in all situations where an employee violated company policy. *See id.* at 630. Further, we held the offer was communicated to the employee when the bank distributed the handbook, and the employee accepted the offer and provided consideration by remaining a bank employee although free to seek other employment. *See id.* at 630. But the section regarding the stability of banking jobs was only a "general statement of policy" and was too indefinite to be an offer. *See id.* In contrast to the provision on disciplinary procedures, we held it was too vague to determine what if anything the bank had agreed to and whether it had performed. *See id.*

■ Subsequent to *Pine River*, in *Hunt* we again addressed whether a provision in a handbook was the basis for a unilateral contract where an employee claimed he was discharged in violation of a unilateral contract based upon an employee handbook. 384 N.W.2d at 856–57. The handbook stated:

> If an employee of the Credit Union is reprimanded or asked to make certain corrections in theif(sic) job performance they will be placed on probation and it will be documented and placed in their personnel file. Improvement must be shown or the employee may be terminated.
>
> * * * *
>
> In the event of a serious offense, an employee will be terminated immediately.

*Id.* at 855. We affirmed summary judgment for the employer holding that because the handbook did not define the term "serious offense," it was too indefinite to constitute an offer as it would leave to a jury the question of what the term means. *See id.* at 857; *but see Lewis*, 389 N.W.2d at 883 (concluding a provision regarding "misconduct serious enough to warrant immediate dismissal" was sufficiently definite). In substance, our holdings have been that to conclude that an employer's statement constitutes an offer for a unilateral contract we require language that is sufficiently definite for a court to discern with specificity what the provision requires of the employer so that if the employer's conduct in terminating the employee or making other decisions affecting the employment is challenged, it can be determined if there has been a breach.

■ Turning to respondents' claims, we consider whether appellant's alleged statements were sufficiently definite to constitute a unilateral offer for specific levels of compensation, employment benefits, and promotional opportunities such that failure to provide them would constitute a breach of contract. The brochures referred to in respondents' complaint give examples of positions on either side of the

ladder at various rungs, and state: "For equivalent levels, pay grades and benefits are the same on both sides of the dual ladder,"[13] and "[w]hichever path, it is the Company's intent that responsibility, recognition and reward for their progress be equivalent–yet recognizing they can't be identical."[14] These references and others describe opportunities for recognition and promotion and express an intent to motivate the technical employee to seek achievement on their preferred side of the ladder, but when we look first for whether a definite offer has been made, we find nothing other than a general description of the dual ladder structure and its purpose to provide those opportunities. There is no suggestion that an individual will be entitled to a specific pay, benefit level, or condition of employment. The brochures in fact demonstrate just the opposite—a clear intent to make the brochures generic so that they would be relevant to the thousands of technical employees they might affect. They describe an "evolving program" to provide a "career development option," an "organizational framework" with emphasis on "flexibility" as a key characteristic.[15]

While opportunities on either side are described as equivalent, there clearly is no intent to contract for a specific right or benefit. One brochure[16] states: "[W]orkability * * * [of the system] cannot be contingent upon **identical** recognition and rewards. This would not only be unrealistic, but contrived. The key is **equivalence**—an equitable **balance** that provides meaningful motivation." Other materials[17] state: "Many employees may not move through all of the phases" and "possible job positions" on either side of the ladder are available based upon performance; but in the end "[p]rogress along either side of the 3M Dual Ladder is based upon continuing demonstration of increased proficiency and performance"[18] and moving to another phase requires "significant accomplishments within the current phase and developing the trust and support of key people."[19]

The heavy reliance of the dissent and the concurrence/dissent on the dual ladder objective of providing equivalence of opportunity as evidence of a unilateral offer misses the point—the denial of opportunity in the abstract, as alleged by respondents, obviously has no substantive importance whatsoever. It must be related to individual employees in terms of diminished career advancement, or some form of loss related to the wrongful denial of that opportunity.

Here prerogative to make decisions as to individual employee promotions, levels of salaries, benefits and responsibilities are clearly reserved to management based upon its evaluation of individual performance and contribution:

> It is the Company's intent that promotion on either side of the Dual Ladder be accompanied by the challenge of added responsibility and, *when these challenges are met,* by the rewards of appropriate recognition.[20]

**13.** Minnesota Mining & Manufacturing Co., *Laboratory Careers* (brochure).

**14.** Minnesota Mining & Manufacturing Co., *The Technical Dual Ladder System–Parallel Paths of Progress* (1981) (brochure).

**15.** Minnesota Mining & Manufacturing Co., *The Technical Dual Ladder System – Parallel Paths of Progress, Parallel Technical Career Paths* (brochures).

**16.** Minnesota Mining & Manufacturing Co., *The Technical Dual Ladder System – Parallel Paths of Progress* (1981) (brochure).

**17.** Minnesota Mining & Manufacturing Co., *Laboratory Careers* (brochure).

**18.** Minnesota Mining & Manufacturing Co., *Parallel Technical Career Paths* (brochure).

**19.** Minnesota Mining & Manufacturing Co., *Laboratory Careers* (brochure).

**20.** Minnesota Mining & Manufacturing Co., *The Technical Dual Ladder System – Parallel Paths of Progress* (1981) (brochure) (emphasis added).

Nowhere do we find the specifics of how an individual employee's pay, benefits, or promotion is to be determined—and therefore, nowhere do we find criteria to determine when rights to such benefits have been breached, or what standard to apply to enforce them. As with the term "serious offense" at issue in the *Hunt* case, descriptions found in appellant's brochures such as "comparable compensation" and "equivalent recognition and rewards" are so ambiguous as to require a jury to make compensation and promotion decisions for appellant—to determine, for example whether respondent Martens earned compensation comparable to that of his technical director counterpart, whoever that might be, and whatever performance or contribution evaluation that employee may have received, or whether respondent Niles was offered promotion opportunities equivalent to that of an administrative employee—but as to which administrative employee, and applying what standards of comparison is not clear. Simply stated, what is missing from respondents' statement of claims is any expression of a standard sufficiently definite to determine to what respondents were entitled, or as to either respondent Martens or Niles, whether they met the "challenge of added responsibility."[21] It appears that in the end what they were entitled to depended upon their individual job performance. After a thorough examination of appellant's printed materials cited in respondents' complaint, we are left with the firm conclusion that they are nothing more than expressions of a general concept of equivalence of opportunity between technical and administrative employees and are too vague and indefinite to constitute a unilateral offer.

■■■ The oral statements alleged by respondents are even less definite. Respondent Martens' claims of compensation opportunities that are "open ended" or "without limit" are meaningless without reference to variables such as whether he met the objectives of his responsibilities in job performance and contributions to corporate goals, standards that would provide a basis for determining if a breach has occurred. Respondent Niles' allegation that various managers told him that promotions up the ladder depended upon performance, not degrees, obviously was not an offer of any specific right as to promotions but rather stated a general policy. Appellant retained the right to evaluate the performance of its technical employees and promote them accordingly.

■■■ Respondent Niles alleges that promotions of technical employees were limited by a "headcount" policy, but he points to no statements by appellant as to the availability of technical promotions other than that opportunities would be equivalent on either side of the ladder. This standard of equivalence is too indefinite to determine whether a specific employee is entitled to a particular promotion and was made in the context of appellant retaining the prerogative to promote employees based on the company's needs and the job performance of individual employees. Similarly, Niles alleges that appellant limited movement of technical employees to the administrative side of the ladder though appellant represented that employees had "flexibility to switch – without penalty" between the sides of the ladder.[22] Again, appellant asserted in general terms that opportunities existed to switch sides but did not provide any specific right to a particular employee attempting to move to the administrative side of the ladder.

Respondents further allege that appellant generally compensated technical employees at a lower level than their administrative counterparts, and respondent Martens alleges in particular that appellant limited compensation for corporate scientists to grade 18 but often compensated technical directors at grade 19 or high-

21. *Id.*

22. Minnesota Mining & Manufacturing Co., *Parallel Technical Career Paths* (brochure).

er. In claiming breach of contract, appellants rely, however, only on statements to the effect that compensation would be equivalent on both sides of the ladder or that pay grades would be the same for technical and administrative employees in equivalent positions. These statements are too .indefinite to provide a particular employee with the right to a specific level of compensation.

Examining respondents' claims from the perspective of determining whether a breach has occurred and whether damages can be calculated, we are further persuaded their claims must fail. A determination of breach and damages would require an examination of personnel decisions with respect to thousands of employees on each side of the dual ladder, delving into subjective evaluations of management as to individual employees' job performance and contribution to company objectives.[23] While pay or promotion based upon time on the job, units of production, meeting

sales objectives and the like are determinable and a breach identifiable, claims of failure to prove an equivalence of promotion opportunity or open-ended compensation opportunity as respondents assert are made in the context of respondents meeting "the challenge of added responsibility"[24] and fall far short of the specific discharge procedures in *Pine River* we held enforceable.[25] We conclude that the oral and written statements alleged by respondents in their complaint fall squarely within our conclusion in *Pine River* that "not every utterance of an employer is binding." *Pine River*, 333 N.W.2d at 630. The dual ladder is a statement of general policy, not a unilateral offer to contract.

Because respondents' have not alleged statements sufficiently specific and definite to rise to the level of an offer for a unilateral contract, we need not reach the issues of communication to the offeree, acceptance of the offer, and consideration given by the offeree. We hold that as to respon-

23. In *MacGill v. Blue Cross of Maryland, Inc.*, 77 Md.App. 613, 551 A.2d 501, 502 (1989), the Maryland Court of Special Appeals addressed an employee's claim that he had a contract with his employer based on various personnel policies regarding non-discrimination and hiring procedures, and that his employer breached the contract by not promoting him as the most qualified candidate. The court held no unilateral contract had been created because in this case the breach could only be determined by reference to how other employees were treated–the *sine qua non* of a unilateral contract however, is that a determination of breach can be made on the basis of reference to treatment of the claimant employee, not others:

> [W]hether an employee was entitled to receive severance pay or whether an employee was terminated in violation of the company's announced termination procedures could be determined by reference only to the circumstances applicable to the affected employee and without regard to that of other employees; there was no necessity of evaluating the relative merit of the employer's decision vis-a-vis the affected employee's claim by reference to similar claims made by some other employee. In short, notwithstanding the generality of their expression, the policies were, in the final analysis, employee specific.

*Id.* at 503.

24. The dissent's comparison to four employees being hired at the same compensation level to do the same job fails to take into account the appellant's repeated statements, in the materials cited in respondents' complaint, that job rewards will be based on individual performance.

25. In *Ladas v. California State Auto. Ass'n*, 19 Cal.App.4th 761, 23 Cal.Rptr.2d 810 (1993), the California Court of Appeal concluded that an insurance company's promises to compensate sales representatives in an amount "comparable" to that received by agents at other insurance companies and to maintain compensation "parity" with "industry standards" were too indefinite to form an offer due to the lack of a "rational method for determining breach or computing damages." *Id.* at 813, 815. The court stated:

> Employers frequently boast of good benefits, competitive salaries, excellent working conditions and the like. To anoint such puffing language with contractual import would open the door to a plethora of specious litigation and constitute a severe and unwarranted intrusion on the ability of business enterprises to manage internal affairs.

*Id.* at 816.

dents' breach of contract claim respondents failed to state a claim upon which relief can be granted for purposes of appellant's motion pursuant to Rule 12.02(e).

## III.

### Promissory Estoppel.

We next turn to respondents' claim that appellant made a promise enforceable under a promissory estoppel theory. Promissory estoppel is an equitable doctrine that "impl[ies] a contract in law where none exists in fact." *Grouse v. Group Health Plan, Inc.*, 306 N.W.2d 114, 116 (Minn.1981); *see also United Elec. Corp. v. All Serv. Elec., Inc.*, 256 N.W.2d 92, 96 (Minn.1977). It requires proof that 1) a clear and definite promise was made, 2) the promisor intended to induce reliance and the promisee in fact relied to his or her detriment, and 3) the promise must be enforced to prevent injustice. *See Cohen v. Cowles Media Co.*, 479 N.W.2d 387, 391 (Minn.1992); *Ruud*, 526 N.W.2d at 372. We have also described the first element of promissory estoppel as requiring that the promisor should reasonably expect to induce action or forbearance on the part of the promisee.[26] *See Grouse*, 306 N.W.2d at 116. Where the facts are not in dispute, as they are not here because we take the facts alleged in the complaint as true for purposes of Rule 12.02(e) review, whether they rise to the level of promissory estop-

pel presents a question of law. *See L & H Transp., Inc. v. Drew Agency, Inc.*, 403 N.W.2d 223, 227 (Minn.1987); *see also Ruud*, 526 N.W.2d at 372 (holding statement too indefinite to be a promise as a matter of law).

We need only reach the first element of promissory estoppel relating to a clear and definite promise. As noted above appellant's description of the dual ladder sets forth only a general framework for compensating and promoting employees and is based upon the employee meeting the "challenge of added responsibility"; it is not a promise sufficiently clear and definite to be enforceable, and thus it obviously is not a promise upon which appellant would reasonably expect to induce reliance. In *Ruud* an employee asked his employer what would happen in the event of a store closing and the employer replied "[g]ood employees are taken care of." 526 N.W.2d at 370. We held this statement was not a clear and definite promise for purposes of promissory estoppel and therefore was not enforceable. *See id.* at 372. While appellant's description of opportunities for equivalent advancement on the dual ladder is no doubt more complex than the employer's statement in *Ruud*, it is no more specific or definite as to its terms.[27]

We therefore hold as a matter of law that respondents have not stated a claim upon which relief can be granted for pur-

---

**26.** The dissent suggests that we require both a clear and definite promise and a promise that would reasonably induce reliance. But these formulations of the elements of promissory estoppel do not differ in meaning. *See Cohen*, 479 N.W.2d at 391 (setting forth requirement of a clear and definite promise but also describing promissory estoppel as requiring "a promise which is expected to induce definite action by the promisee").

**27.** The dissent compares this case to *Cohen*, where we held that a reporter's promise to keep a source confidential must be enforced to prevent injustice. 479 N.W.2d at 391–92. But *Cohen* does not involve an employment dispute. Unlike a promise not to divulge a source, easily proven when violated, it is substantially more difficult to elevate a promise

to provide equivalence of opportunity into a unilateral offer of employment.

The dissent also states that we have "conflate[d]" the contract requirement of an offer with the promissory estoppel requirement of a promise and emphasizes that promissory estoppel is a doctrine based upon reliance, rather than consideration. While we do not disagree with this proposition, it does not dispense with the need to prove that a clear and definite promise was made upon which the claimant relied. If, as we hold, the promise lacks sufficient clarity and definiteness to determine if there has been performance, proof would be equally lacking as to on what the respondents could rely for purposes of their promissory estoppel claim.

poses of appellant's Rule 12.02(e) motion with regard to their promissory estoppel claim.

## IV.

### Fraud.

■■■■ Respondents allege that because appellant's representations regarding the dual ladder system were made knowing they were false or with deliberate disregard of their truth or falsity, the representations were fraudulent. Our case law establishes a high threshold of proof for such a claim. It must be pled with specificity that there was a false representation regarding a past or present fact, the fact was material and susceptible of knowledge, the representer knew it was false or asserted it as his or her own knowledge without knowing whether it was true or false, the representer intended to induce the claimant to act or justify the claimant in acting, the claimant was induced to act or justified in acting in reliance on the representation, the claimant suffered damages, and the representation was the proximate cause of the damages. *See Vandeputte v. Soderholm*, 298 Minn. 505, 507–08, 216 N.W.2d 144, 146 (1974); *see also* Minn. R. Civ. P. 9.02; *Twin Ports Oil Co. v. Whiteside*, 218 Minn. 78, 81, 15 N.W.2d 125, 126 (1944).

■■■■ Where a representation regarding a future event is alleged, as here, an additional element of proof is that the party making the representation had no intention of performing when the promise was made:

> It is a well-settled rule that a representation or expectation as to future acts is not a sufficient basis to support an action for fraud merely because the represented act or event did not take place. It is true that a misrepresentation of a present intention could amount to fraud. However, it must be made affirmatively to appear that the promisor had no intention to perform at the time the promise was made.

*Vandeputte*, 298 Minn. at 508, 216 N.W.2d at 147 (citations omitted). Further, neither opinions nor statements that are "general and indefinite" are representations of fact. *See, e.g., Swedeen v. Swedeen*, 270 Minn. 491, 495, 134 N.W.2d 871, 875 (1965).

For the same reason that respondents have failed to state a claim as to which relief can be granted in their assertion that appellant's statements regarding the dual ladder program establishes a unilateral contract, or a claim for promissory estoppel, their fraud claim also must fail, as appellant's general statements alleged to constitute fraud fall far short of our established principles of proof of fraud. Appellant described possible positions and promotion opportunities for employees on either side of the dual ladder but consistently qualified such statements as dependent upon an individual employee's performance and contribution to the company. While appellant certainly represented that at various rungs of the ladder pay grades and benefits are equivalent, it did not represent that respondents Martens or Niles or any other specific employee would receive the same salary or benefits as an employee on the administrative side of the ladder. The two sides of the ladder were described as equivalent but not identical, and what each employee would be compensated or how or when each employee would be promoted was couched in terms of the employee's own performance. This description constitutes a statement of policy, not a representation of fact. Further, the complaint is devoid of any specific claim that appellant's statements were representations the appellant knew were false or had no intention of fulfilling at the time they were made. We conclude respondents have failed to state a claim as to fraud not because we apply a contract standard of definiteness to a fraud claim, as the dissent asserts, but because the complaint does not set forth with specificity the elements of a fraud claim—in particular, that appellant knowingly made

false representations of past or present facts that were susceptible of knowledge. We therefore hold appellant is entitled to dismissal pursuant to its Rule 12.02(e) motion with respect to respondent's fraud claim.

The district court did not err in dismissing respondents' fraud claim.

## V.

### Dismissal.

▮ Finally, we consider the appropriate disposition, given our rulings on respondents' claims. Even taking as true respondents' factual allegations regarding appellant's dual ladder program, we conclude that because the written and oral statements regarding the dual ladder program lacked the fundamental characteristics of definiteness and specificity that are the hallmark of a unilateral contract, respondents have failed to state a claim as to which relief can be granted for purposes of Rule 12.02(e). An employer's general expression of a plan of promotion and recognition does not, under our established precedent, rise to the level of a unilateral contract or establish a basis for a promissory estoppel claim. Respondents' allegations of fraud also fall far short of the established requirements for fraudulent misrepresentation. We therefore hold that the respondents' complaint should be dismissed with prejudice and on the merits pursuant to appellant's Rule 12.02(e) motion for failure to state a claim upon which relief can be granted. *See Vesely, Otto, Miller & Keefe v. Blake,* 311 N.W.2d 3, 6 (Minn.1981); *O'Neil v. Swan,* 299 Minn. 206, 206–07, 218 N.W.2d 457, 457 (1974). We reverse the court of appeals and remand to the district court for entry of an order of dismissal as to all counts of the complaint, with prejudice.

Reversed and remanded for dismissal with prejudice.

PAGE and LANCASTER, JJ., took no part,

PAUL H. ANDERSON, Justice (concurring in part, dissenting in part).

I concur in part and dissent in part. I agree with the majority's conclusion that respondents have failed to state a claim for fraud. But I disagree with the majority's conclusion that respondents failed to state a claim for breach of contract and promissory estoppel. The matter before us has been treated throughout under a Rule 12 motion and, in the context of such a motion, the majority has prematurely dismissed this action.

There is no dispute that a bilateral employment contract exists between respondents and 3M. But we have acknowledged that "an original employment contract may be modified or replaced by a subsequent unilateral contract." *Pine River State Bank v. Mettille,* 333 N.W.2d 622, 627 (Minn.1983). Therefore, the central issue before us is whether 3M's oral and written statements formed a binding unilateral contract offer. I agree with the majority's conclusion that we should address the issue of whether the oral and written statements alleged to have been made by 3M can constitute a unilateral contract offer as a matter of law. But it is here where I depart from the majority's analysis. The majority establishes a test for specificity in the complaint that is too stringent—it demands too much. Further, the majority defines the test in terms of standards for individual advancement. Such a test does not address the nature of the contract alleged—that is, that under 3M's dual ladder system, there would be equivalent or comparable opportunities for advancement.

The respondents assert that 3M's offer is of equivalent or comparable opportunities. Therefore, the issue at this stage of the proceedings is not whether an individual employee deserves a certain salary, position, or benefit, but whether there was any opportunity for scientific and technical employees to achieve equivalence. It is not clear to me, especially in an action of this type, why respondents' allegations

which include cumulative disparities in salaries, benefits, and promotions, together with the allegations specific to themselves, are not sufficient for this action to survive a Rule 12 motion. Whether respondents can survive a summary judgment motion or will have problems proving causation or in proving any particular individual's case are separate issues, but these issues are not before us, at least not yet.

I also disagree with the majority's conclusion that the terms "comparable compensation" and "equivalent recognition and reward" are so ambiguous that respondents' claim lacks any expression of a standard sufficiently definite to determine to what respondents are entitled. Such a conclusion ignores the fact that similar terms are routinely used and analyzed by courts as standards in employment actions and other similar cases. *See, e.g., Marty v. Digital Equip. Corp.,* 345 N.W.2d 773, 775 (Minn.1984) (evaluating whether an offered, but refused, position was "substantially equivalent" to the original position held by the employee); *Polley v. Gopher Bearing Co.,* 478 N.W.2d 775, 778 (Minn. App.1991), *rev. denied* (Minn. Jan. 30, 1992) (evaluating whether duties, salary, and hours were "comparable" as required under the Parenting Leave Act, Minn.Stat. §§ 181.940–.944 (1990)); *Holbrook v. Minnesota Museum of Art,* 405 N.W.2d 537, 539–40 (Minn.App.1987), *rev. denied* (Minn., July 15, 1987) (evaluating whether the pay scales in two positions were equivalent). Equal Pay Act cases address similar concepts. *See, e.g., Danz v. Jones,* 263 N.W.2d 395, 400–01 (Minn.1978) (analyzing the "validity of differing pay rates given for allegedly different jobs").

Finally, lurking in the background of the breach of contract issue is whether there is or should be a more stringent standard of specificity for a unilateral offer of contract than for a bilateral contract. I doubt we would have this dispute before us if respondents and 3M had entered into a written contract promising "equivalence" in the same terms as represented by 3M's oral and written statements. Under such circumstances, there would be a contract, but in such an instance, at least both sides would know that they were contracting for something. Arguably, in the unilateral offer situation, the standard of specificity should be higher because an employer may not know that its general statements are contractual terms to which it may be held accountable. Here, the majority does not directly address this issue, yet implicitly sets a higher standard, but when doing so, establishes a standard for specificity in the complaint that virtually eliminates a valid cause of action. A more appropriate result would be to hold, as I would, that under the rule articulated in *Pine River* respondents have sufficiently stated a claim for unilateral contract so that their action survives 3M's Rule 12 motion to dismiss their breach of contract claim.

Promissory estoppel "focuses on the reasonableness of the employee's reliance to create a contractual obligation * * *." *Christensen v. Minneapolis Mun. Employees Retirement Bd.,* 331 N.W.2d 740, 750 (Minn.1983). It provides a different analytic approach than does the analysis used for a unilateral contract. *Id.* at 748. The analytic focus for promissory estoppel should not rest only on whether the alleged promise is clear and definite, but must focus on whether there was a promise made that was, or reasonably should have been, expected to induce reliance on the part of the promisee. *See* Restatement (Second) of Contracts § 90 (1981). Therefore, I disagree with the holding of the majority on promissory estoppel and join in the dissent's conclusion that under a Rule 12 motion, dismissal of respondents' cause of action for promissory estoppel is inappropriate at this stage of the proceedings.

GILBERT, Justice (dissenting).

I respectfully dissent. This case involves employment claims with many significant factual allegations based on a long-established "dual ladder" employment poli-

cy that has been the essence of 3M's corporate employment culture for almost 50 years. It has been consistently used by 3M to recruit, retain and reward long-term employees. However, the majority dismisses on the pleadings two long-term technical employees' colorable dual ladder claims of breach of contract, promissory estoppel and fraud. The majority holds that under no possible set of facts that the respondents might prove in this case would they be entitled to relief under the theories pleaded in the complaint.

As the majority observed, the dual ladder system began at 3M in the 1950's. Its approach was innovative and commendable. The plan recognized the valuable contributions of scientific, technical and management personnel to 3M. It acknowledged that while management positions generally offered greater compensation and opportunities for promotion, 3M derived significant benefits from encouraging its technical personnel to remain scientists and technicians rather than crossing over into management. In order to encourage scientists and technicians to remain on the scientific and technical side of the ladder, 3M assured such personnel in all manners of communications and representations that if they did so, they would enjoy opportunities for promotion and compensation equivalent to that of management. 3M provided a written brochure explaining the dual ladder system entitled *Parallel Paths of Progress*. Another brochure, *Laboratory Careers*, specifically informs the technical employees that "for equivalent levels, pay grades and benefits *are the same* on both sides of the dual ladder." (emphasis added).

To achieve any of this system's purported goals required that the technical employees of 3M believed that 3M meant what it said. In simple terms, for this program to have been effective, the employees would have had to rely on the communications and representations of 3M management.

The majority rejects the respondents' claims as a matter of law. This is done despite the significant benefits 3M derived from the dual ladder system, the reliance the employees of 3M may have reasonably placed on these representations and the fact that 3M may have never intended to provide such equivalent opportunities. In fact, the two sides of the dual ladder were alleged by the plaintiffs to have little in common except for the representation of equality. The management side of the ladder on a regular basis received bonuses, stock options, and higher salaries that are alleged to have been systematically denied to the technical employees. The majority's conclusion is at odds with our prior decisions on the issues and is inappropriate at this stage of a proceeding.

This matter is presented to us on 3M's appeal from the court of appeals' reversal of the trial court's Minn. R. Civ. P. 12.02(e) dismissal of respondents' promissory estoppel and fraud claims and of its affirmance of the trial court's denial of dismissal of the breach of contract claims. The only question on review of a judgment on the pleadings "is whether the complaint sets forth a *legally sufficient* claim for relief." *Elzie v. Comm'r of Pub. Safety*, 298 N.W.2d 29, 32 (Minn.1980). If questions of fact exist, the court should not order judgment on the pleadings. *See, e.g., State ex rel. Minneapolis v. Minneapolis St. Ry. Co.*, 238 Minn. 218, 225–26, 56 N.W.2d 564, 568 (1952). As we explained in *Northern States Power Co. v. Franklin*,

No longer is a pleader required to allege facts and every element of a cause of action. A claim is sufficient against a motion to dismiss based on Rule 12.02[e] if it is possible on any evidence which might be produced, consistent with the pleader's theory, to grant the relief demanded. *To state it another way, under this rule a pleading will be dismissed only if it appears to a certainty that no facts, which could be introduced consistent with the pleading, exist which*

*would support granting the relief demanded. Addressing ourselves to the sufficiency of \* \* \* [claims] under Rule 8, we are thus required to do little more than engage in an exercise in theoretical logic.*

265 Minn. 391, 395, 122 N.W.2d 26, 29 (1963) (emphasis added).

The majority here claims that all three of these issues may be dismissed on the pleadings because we may decide that there are no issues of fact to be decided. This is incorrect with respect to all three issues: contract, promissory estoppel, and fraud.

The majority blurs the standard of review. It holds that determining whether a unilateral offer was made is a question of law that must be resolved by the court. It reaches this conclusion by relying on *Ruud v. Great Plains Supply,* 526 N.W.2d 369 (Minn.1995) and *Hunt v. IBM Mid Am. Employees Fed. Credit Union,* 384 N.W.2d 853 (Minn.1986). In both those cases the court held as a matter of law that unilateral offers did not exist. *See Ruud,* 526 N.W.2d at 372; *Hunt,* 384 N.W.2d at 857. However, both of those cases involved facts and allegations that were much weaker than those stated here. In *Ruud,* the only fact alleged in support of the claim that there was a unilateral offer was a statement by the owner of Great Plains Supply that "Good employees [are taken] care of." 526 N.W.2d at 370. In *Hunt,* the only facts alleged in support of a claim that employees could be terminated only for cause were two brief statements in an employee manual that mentioned probation and termination for serious offenses. 384 N.W.2d at 855.

In both cases, it was possible for the court, based on the minimal facts alleged, to determine that as a matter of law a unilateral contract was not created. However, in the case at hand, a much stronger and more detailed set of facts is alleged. If all of these facts are viewed in a light most favorable to the plaintiffs (now respondents), it is not possible to determine as a matter of law that a unilateral offer did not exist.

The majority claims that the dismissal of the contract claim is warranted because any representations made by 3M to its employees were simply too indefinite to constitute a valid offer. The general rule is that where the intention of the parties may be gained wholly from the writing, construction of a contract is a question of law for the court. *See Donnay v. Boulware,* 275 Minn. 37, 44, 144 N.W.2d 711, 716 (1966). However, where the terms are not clear and unambiguous, construction becomes a question of fact unless extrinsic evidence is conclusive. *See id.* at 44, 144 N.W.2d at 716; *see also Hartung v. Billmeier,* 243 Minn. 148, 151, 66 N.W.2d 784, 788 (1954) (stating that where an oral contract is susceptible to more than one construction, its construction is for the jury). Here, the complaint alleges that 3M made written and oral representations that constituted a valid offer. While the complaint pleaded some specific facts, there is nothing in the complaint to suggest that those facts are exhaustive or that discovery and some factual determination would not be necessary before the exact nature of these representations is made clear.

The plaintiffs have pleaded facts to support their assertion that 3M's representations constituted an offer that became a significant term of their employment contract. These alleged facts include 3M's publications, oral representations by management and a substantial and continuous course of dealings with its employees. The contract term allegedly offered is that technicians and scientists would be compensated and promoted in a fashion equivalent to the management side of the "dual ladder."[1] The employees' retention of employment constitutes the acceptance of the offer of a unilateral contract. *See Pine*

---

1. Dual is defined as " \* \* \* containing two or being one of two often identical parts \* \* \* " Webster's Third New International Dictionary 697 (1993).

*River State Bank v. Mettille,* 333 N.W.2d 622, 627 (Minn.1983). Importantly, there is no dispute here that there is an employment contract between the plaintiffs and 3M. However, there is no one, clear and unambiguous document from which this court may construe the terms of this employment contract. Accordingly, before we can render a legal conclusion about the definiteness of an offer, there first must be a factual determination of what offer, if any, was made. The majority position here is tantamount to a legal rule that nothing an employer could do or say to its employees will ever constitute an offer.

The majority cites to a number of our earlier decisions to justify its denial of this claim as a matter of law, however, those earlier cases are distinguishable on two important points. First, all of these earlier cases, *Hunt, Pine River,* and *Cederstrand* all dealt with the same issue: whether a unilateral offer contained in an employee handbook was definite enough to overcome the presumption of at-will employment. *See Hunt v. IBM Am. Employees Fed. Credit Union,* 384 N.W.2d at 855–57 (Minn.1986); *Pine River State Bank v. Mettille,* 333 N.W.2d at 625–27 (Minn.1983); *Cederstrand v. Lutheran Bhd.,* 263 Minn. 520, 526, 117 N.W.2d 213, 217 (1962). This case does not present the contested agreement in one complete document like an employee handbook. Because there are factual questions as to exactly what agreement existed, judgment on the pleadings is inappropriate.

Second, this case does not involve an employment at-will issue. Rather, it deals with the rights created by the agreed upon dual ladder compensation scheme. These employees were not terminated; they are simply seeking the benefit of 3M's promises. We must therefore determine what obligation an employer has who promises certain terms in exchange for an employee's labor when an employee relies on the representation. If a person hired four people to do a particular job and agrees that they will all be paid equivalently, and then pays two of the employees bonuses it does not pay the other two, the employees who did not receive the bonus have a claim for breach of contract. Whether or not they were in fact paid equivalently is a question for the jury. While certainly more complex, that is the situation presented in this case.

The respondents next allege that 3M breached the contract terms created. They are not alleging that they were personally denied specific pay increases or promotions as the majority claims, but that they were systematically denied the opportunity for equivalent compensation benefits. First, they allege 3M limited the levels to which scientists and technicians could be promoted in a manner that management employees were not. Second, 3M systematically precluded technicians from additional compensation and bonus programs available to management employees. Next, 3M utilized a "headcount" system to limit promotions of technicians and scientists, while management promotions remained open-ended. Finally, 3M limited mobility between the technical side of the dual ladder and the management side. The precise amount of damages, if any, can be developed through discovery.

The majority also appears concerned over the remedy that plaintiffs seek in this matter. The plaintiffs do not seek specific performance, as the majority asserts, they seek damages and have asserted the damages with sufficient specificity for this stage of the proceeding. The majority expresses concern that there is no way to determine specifically what pay increases or benefits these plaintiffs were denied. Even if this proves to be true, such damages are not the only basis for recovery for a breach of contract claim. Losses resulting from a party's reasonable reliance on performance of a contract are also recoverable in a breach of contract action. *See* Restatement (Second) of Contracts § 349 (1981). Even if the damages are difficult to determine, the court cannot consequently hold that a contract did not exist.

Further, the majority asserts that this agreement is too vague because any benefits under the dual ladder program are based on "individual job performance" and whether an employee meets "the challenge of added responsibility." Again, the majority's determination that such terms form a material part of any agreement is a factual determination, inappropriate for dismissal on the pleadings. More importantly, there is no dispute in this case concerning the performance of these two plaintiffs. Accepting the facts as pleaded, these are senior employees who have been repeatedly promoted and have received excellent evaluations at virtually every level. While satisfaction clauses like this one are always vague to some degree, we regularly enforce such terms. *See, e.g., Steller v. Thomas,* 232 Minn. 275, 284–85, 45 N.W.2d 537, 543 (1950) (citing Restatement of Contracts § 261). Judging this matter on the pleadings, we must assume these plaintiffs have met all "individual job performance" requirements.

The majority, in concluding that any representations concerning the dual ladder system are too indefinite to constitute an offer, engages in a factual analysis based on the pleadings and concludes that the plaintiffs have no claim. However, factual determinations are not the basis for dismissal on the pleadings. All of the facts have not been uncovered at this point. Discovery has not been completed. Further, the majority seems to base its entire decision on selective published statements by 3M. In doing so, it ignores other statements to the contrary as well as the statements by supervisors and a course of conduct in the context of 3M's extensive corporate culture.

We have long held that dismissal of a contract claim for indefiniteness is disfavored. *See Hartung,* 243 Minn. at 151, 66 N.W.2d at 788. In *Hartung,* we recognized:

Although vagueness and indefiniteness may prevent the creation of a contract, it is not to be forgotten that any offer or agreement is indefinite and uncertain in some degree since words are but imperfect symbols of what each party understands and intends. A proper administration of justice does not permit an overzealous quest for subtle ambiguity to destroy the intent of the parties when the court, despite some incompleteness and imperfection of expression, can reasonably find that intent * * *.

*Id.* at 150–51; 66 N.W.2d at 787–88. (footnote omitted).

In this case, the majority's quest to find incompleteness is being performed even before a proper determination has been made as to what representations were made and exactly what, if anything, constituted the agreement. Such an analysis is properly a question of fact, upon which determinations of law may then be made. *See, e.g., id.* at 151, 66 N.W.2d at 788; *Johnson v. Urie,* 405 N.W.2d 887, 891 n. 5 (Minn.1987). In *Johnson,* we were asked to determine whether a legal duty existed for an insurance agent to inform the insured of alternative coverage available. *See Johnson,* 405 N.W.2d at 889. We stated that while determining whether a legal duty existed was a question of law, if that determination turned on disputed facts, those factual determinations might be made by a jury. *See id.* at 891 n. 5. The court would then make its legal determination based on those findings. *See id.*

The present case requires a similar resolution. The terms of this agreement are bound up in a myriad of representations spanning some 50 years of 3M's history. The pleadings indicate they were in the literature cited by the majority, but also in the statements of individual supervisors and in the context of 3M's corporate culture and its course of dealings with its employees. All of these factors need to be taken into account before any clear *factual* determination may be made as to what was promised by 3M. *See Donnay,* 275 Minn. at 44, 144 N.W.2d at 716 (stating that course of dealings and conduct of the parties with regard to terms is persuasive

evidence of their meaning). Once the terms of this agreement are adequately determined by a finder of fact, then a legal determination as to its definiteness may be made.

I cannot agree with the majority that, as a matter of law, the plaintiffs have failed to state a colorable claim of breach of contact on the face of their well-pleaded complaint. Accordingly, I would affirm the court of appeals' holding on this issue.

With respect to the promissory estoppel claim, the majority errs in two fundamental respects. First, it overstates a legal element necessary to establish a promissory estoppel claim. Second, it conflates the definiteness standard for an offer with the legal standard for a promise under our case law on promissory estoppel.

The majority cites to our holding in *Ruud v. Great Plains Supply, Inc.,* to establish the elements required for a claim of promissory estoppel. In *Ruud,* citing our earlier decision in *Cohen v. Cowles Media Co.,* 479 N.W.2d 387, 391 (Minn. 1992), we stated that the elements necessary to establish a claim of promissory estopppel were:

1. Was there a clear and definite promise?

2. Did the promisor intend to induce reliance, and did such reliance occur?

3. Must the promise be enforced to prevent an injustice?

*Ruud,* 526 N.W.2d at 372.

The majority goes on to hold that because the promise in this case does not meet the first requirement of a "clear and definite promise," the claim must fail as a matter of law. This analysis is problematic on two levels.

First, assuming as we must on appeal from a motion to dismiss on the pleadings, that all of the allegations of the complaint are true, as stated earlier, the representations in this case are much more definite than those made in *Ruud.* Respondents attached to their complaint a 3M document entitled *Laboratory Careers* that states: "For equivalent levels, pay grades and benefits *are the same* on both sides of the dual ladder." (emphasis added). These promises were expected to induce definitive action by the 3M employees and did induce the action. These promises are thus binding if injustice can be avoided only by enforcing the conduct. *See Cohen,* 479 N.W.2d at 391. In *Cohen,* we held as a matter of law that the undisputed and unambiguous promise of anonymity given by a news reporter to a person who supplied damaging information about a candidate for political office was clear and definite. *See id.* In reliance on the promise, Cohen turned over the records, the promisor broke his promise, and Cohen lost his job. *See id.* We then held that the test is whether enforcement is required to prevent an injustice. *See id.* We then concluded the resulting harm required a remedy to avoid an injustice. *See id.* at 392.

Second, and more importantly however, in neither *Ruud* nor *Cohen* did we articulate a standard by which the "clearness" or "definiteness" of a given promise could be judged. Furthermore, in *Cohen,* the ambiguity of the promise was not in dispute. 479 N.W.2d at 391. Nor does either of these cases suggest a departure from our other holdings on promissory estoppel.

We have repeatedly relied on the articulation of promissory estoppel found in the Restatement (Second) of Contracts § 90 (1981). *See, e.g., AFSCME Councils 6, 14, 65 and 96, AFL–CIO v. Sundquist,* 338 N.W.2d 560, 568 (Minn.1983); *Grouse v. Group Health Plan, Inc.,* 306 N.W.2d 114, 116 (Minn.1981).[2] Section 90 states:

A promise which the promisor should reasonably expect to induce action or

---

**2.** Our earlier cases relied on section 90 of the Restatement of Contracts (1932) as the articulation of the standard for promissory estoppel. *See, e.g., Grouse,* 306 N.W.2d at 116.

The language relevant to this case remains the same in Restatement (Second) of Contracts (1981).

forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.

Restatement (Second) of Contracts § 90 (1981).

We have echoed this standard in the employment context stating that promissory estoppel may be used to enforce promises "which the promisor expected or should have reasonably expected to induce action of a definite and substantial character by the promisee * * *." *Sundquist,* 338 N.W.2d at 568. The common question in these statements is whether there was a promise made that was, or reasonably should have been, expected to induce reliance on the part of another.

No statement in either *Ruud* or *Cohen* is in direct conflict with these other decisions or suggests that its three-part standard is more restrictive in any way. The "clear and definite" promise is another way of saying a promise that is or reasonably should be expected to induce reliance. The majority indicates that for a promise to be a proper basis for recovery under promissory estoppel that promise must be both "clear and definite" and reasonably induce reliance. However, nothing in our prior cases suggests this to be the standard. Rather, the test is if a promise is such that "the promisor should reasonably expect [it] to induce action or forbearance on the part of the promisee," Restatement (Second) of Contracts § 90, the promise is clear and definite enough for justice to require a remedy for losses reasonably incurred by such reliance.

Whether representations by 3M meet this "reasonable reliance" standard is a question of fact for the jury. Only in the clearest of cases, like *Ruud,* or in cases where the facts have been undisputed as they were in *Cohen,* should we decide the issue of ambiguity as a matter of law. The majority, in its rush to dismiss the respondent's claims, makes the elements of promissory estoppel more restrictive without

justification from the precedent cited. To decide this issue as a matter law is inappropriate and inconsistent with our prior rulings. If the facts pled did turn out to be true, enforcement would be required to prevent an injustice.

Further, the majority also implies that the standard for a "clear and definite" promise in promissory estoppel is the same or substantially similar to the definiteness standard for offers. As noted above, neither *Ruud* nor *Cohen* provides any justification for this view.

Promissory estoppel is a theory that rises out of the court's equitable powers and is used "to imply a contract in law where none exists in fact." *Grouse,* 306 N.W.2d at 116. Though often used as an alternative theory in contract disputes, we have stated that: "Promissory estoppel is not a substitute for acceptance, consideration, or mutuality, but a doctrine based on reliance which courts may use in a proper case to prevent injustice." *Constructors Supply Co. v. Bostrom Sheet Metal Works Inc.,* 291 Minn. 113, 120, 190 N.W.2d 71, 75 (1971).

To conflate the contract requirements of offer and acceptance with the promise and reliance requirements of promissory estoppel is unjustified and contrary to the distinct nature of these theories. It is completely possible that a contract claim may fail because the offer failed for indefiniteness. But, where that same offer is found to have been a promise reasonably expected to induce reliance in the offeree, that promise may be enforced to the extent justice requires. By conflating the "clear and definite" language of *Ruud* and *Cohen* with the definiteness standard for offers, the majority has unreasonably and unjustifiably changed the law of promissory estoppel.

For all the above reasons, I cannot agree with the majority that as a matter of law the respondents have failed to state a claim for which relief could be granted under their claim of promissory estoppel.

As noted earlier, under the facts as alleged in the complaint, what purpose could the dual ladder system serve if 3M employees were not intended to rely on it? While 3M's counsel asserted at oral arguments that its employees could not reasonably rely on *any* of these statements, it challenges credulity to suggest that 3M never intended its employees to rely on the dual ladder program. At the very least, there is a question of fact to be resolved here. I would affirm the court of appeals on this issue as well.

Finally, the majority summarily dismisses the fraud claim with the same cursory dispatch it gave to the promissory estoppel claim, once again using its indefiniteness analysis. Such a standard is as inappropriate here as it was for promissory estoppel.

While it is true that a fraud claim must be pleaded with specificity, the respondents have done so. To establish fraud a complaint must allege "(1) False representations; (2) made with the intent to deceive; (3) plaintiffs took action or refrained from taking action in reliance on these misstatements; (4) resulting in damages; (5) which are proximately caused by the misstatements." *Atcas v. Credit Clearing Corp. of Am.*, 292 Minn. 334, 349, 197 N.W.2d 448, 457 (1972).

The complaint in this matter makes a detailed record of representations made and their content concerning the dual ladder program. It alleges that these representations were false and details the reasons for this belief: management employees at the same and lower levels of seniority "advance far beyond [them] in terms of compensation, responsibility and recognition;" there is a "huge annual salary disparity," and "lost stock options [and] profit sharing;" 3M created "a covert compensation fund entitled the Performance Unit Plan (PUP), which is designed to secretly and significantly increase the compensation of 3M management employees"; "[n]o technical employee has ever been permitted to participate in the PUP Fund"; and "a 'head count' policy at 3M limits the number of technical employees who may advance into successively higher positions on the Dual Ladder."

These disparities are alleged to have cost respondents lost base compensation of over $100,000 per year as well as up to $500,000 per year in lost profit sharing, stock options and other compensation, which were paid to management employees at the same level as the technical employees on the dual ladder. While they do not allege intent or knowledge with specificity, Minn. R. Civ. P. 9.02 does not require them to do so. *See* Minn. R. Civ. P. 9.02 (stating "malice, intent, knowledge and other condition of mind of a person may be averred generally.").

The majority seems to claim that since the claim here failed to meet the definiteness standard under contract theory, it also fails as a representation under the fraud theory. However, we have upheld fraud verdicts on evidence similar to that which the respondents allege here. In *Hollerman v. F.H. Peavey & Co.*, we held that statements in a brochure discussing future profits for investors in a poultry business, when combined with false statements by the poultry farm's agent concerning the health of the chickens, were sufficient to support a jury verdict of fraud. 269 Minn. 221, 229, 130 N.W.2d 534, 540 (1964). In this case, we have numerous representations in published material, also combined with statements by supervisors and other 3M agents. Whether alone or in combination these representations constitute fraud based on 3M's behavior is again a question of fact.

The statements contained in the publications cited by the majority would be false statements of present fact if 3M knew or should have known when it made them that the program did not offer the opportunities claimed. They may also be, as the majority asserts, statements of future fact, which 3M never intended to go through

with. These are factual questions for a jury to decide, or to be decided on summary judgment, if no material issues of fact can be supported. It is not appropriate for this court to dismiss these claims on the pleadings. I would affirm the court of appeals on this issue as well.

As we stated in *Northern States Power*, we should dismiss a case on the pleadings "only if it appears to a certainty that no facts, which could be introduced consistent with the pleading, exist which would support granting the relief demanded. * * * [W]e are thus required to do little more than engage in an exercise in theoretical logic." 265 Minn. at 395, 122 N.W.2d at 29. The majority cannot artificially limit its analysis to a few select facts and dismiss this action for a failure to state a claim. If we accept as true the well-pleaded complaint, the majority's analysis here is tantamount to stating that under no set of circumstances may 3M's statements to its employees be enforced, regardless of what they said. This would be so even if reliance was reasonably induced and 3M knew all along that they would never go through with the plan. I do not believe that our case law supports such a conclusion.

At this embryonic stage of a case, dismissal on the pleadings is a harsh remedy justified only when it is impossible on any evidence that might be produced to grant the relief requested. *See id.*, 122 N.W.2d at 29. Before discovery, we do not even know what most of those facts are and their determination is not necessary at this stage of the proceeding. Respondents' allegations on the record make dismissal inappropriate. I would affirm the decision of the court of appeals on all three issues; breach of contract, promissory estoppel and fraud, and remand to the district court for further proceedings.